STEVEN A. NUTTING, Individually and as Parent of JONATHAN NUTTING, an Infant, et al., Respondents, v FORD MOTOR COMPANY, Respondent-Appellant, CATHERINE A. NUTTING, Respondent, and HEWLETT-PACKARD COMPANY, Defendant and Third-Party Plaintiff-Appellant-Respondent. LAZARE LINCOLN-MERCURY INC., Third-Party Defendant-Appellant.

Third Department, May 21, 1992

APPEARANCES OF COUNSEL

*Bouck, Holloway, Kiernan & Casey (Eric A. Portuguese [Lester, Schwab, Katz & Dwyer] and John R. Casey* of counsel), for defendant and third-party plaintiff-appellant-respondent.

*Rowley, Forrest, O'Donnell & Hite, P. C. (David Miranda and Thomas J. Forrest* of counsel), for third-party defendant-appellant.

*Bond, Schoeneck & King (John M. Freyer, Carl Rosenbloom and Arthur J. Siegel* of counsel), for Steven A. Nutting and others, respondents.

*Kelleher & Flink (Arieh Mezoff and Edward G. Flink* of counsel), for Catherine A. Nutting, respondent.

*Gibson, McAskill & Crosby (Mark Spitler* of counsel), for respondent-appellant.

## OPINION OF THE COURT

CASEY, J.

This action arises out of an automobile accident which allegedly occurred when the 1984 Mercury Marquis station wagon being driven by defendant Catherine A. Nutting (hereinafter Nutting) drifted into the path of an oncoming vehicle while she was attempting to cope with a stalled engine. Plaintiffs represent the two children who were riding in the rear seat of the Nutting vehicle; one of the children died as a

result of the accident and the other sustained serious injuries. Also named as defendants in this action are Ford Motor Company (hereinafter Ford), which manufactured the vehicle Nutting was driving, and Hewlett-Packard Company (hereinafter HP), which purchased the vehicle from Ford in August 1983 as part of a fleet of some 3,290 vehicles purchased during the 1984 model year for use by its employees.

During the period of HP's ownership, the vehicle was serviced periodically by Lazare Lincoln-Mercury Inc. (hereinafter Lazare), against which HP has asserted a third-party claim seeking indemnification or contribution. HP disposed of the vehicle pursuant to its "Elite Fleet" program at an auction conducted by its agent in January 1985. The vehicle, which had been driven nearly 33,000 miles, was purchased by Hi-Way Motors, a used car business conducted by Nutting's father. Title to the vehicle was thereafter transferred to Nutting and her husband, who drove the vehicle for approximately 15,000 miles prior to the accident in December 1985.

Plaintiffs entered into settlements with Ford and Nutting. The parties thereafter moved pursuant to CPLR 3211 and/or 3212 for dismissal of the various claims, cross claims and a counterclaim asserted against or by HP. Supreme Court's order disposing of the motions resulted in these appeals by HP, Lazare and Ford.

Plaintiffs' complaint asserts five causes of action against HP which are relevant to this appeal: negligence; breach of express and implied warranties; strict products liability; reckless conduct for which punitive damages are sought; and fraudulent conduct for which punitive damages are sought. According to plaintiffs, the vehicle had a long-standing problem of stalling during the period that it was owned by HP, which HP was aware of but did not repair. Plaintiffs assert that despite actual knowledge of this serious defect, HP offered the vehicle for sale as a well-maintained reconditioned vehicle with no defects other than those listed on the bill of sale, which did not refer to the stalling problem. The Nuttings relied upon these representations, according to plaintiffs, and would not have purchased the vehicle if the stalling problem had been disclosed. The sale of large numbers of vehicles used by its employees is a regular part of HP's business which, according to plaintiffs, subjects HP to strict products liability and liability for breach of implied warranty. The punitive damages claims are premised upon the theory that HP acted recklessly

and/or fraudulently in offering the vehicle for sale to the public with a known but undisclosed serious defect.

HP contends that it is a casual or occasional seller of surplus vehicles, subject only to the duty to warn of known defects that are not obvious or readily discernible. According to HP, the sole proximate cause of the accident was the Nuttings' voluntary and unreasonable decision to continue driving the vehicle after the stalling problem first appeared in April 1985 without having the vehicle repaired despite numerous instances of stalling experienced by the Nuttings prior to the accident. HP also contends that it made no representation upon which the Nuttings could justifiably rely and that it did not act maliciously, willfully or with evil motives.

■ We begin by holding that one who regularly purchases a substantial quantity of new cars for use by its employees and regularly disposes of those vehicles by auction sales to used car dealers for resale to the public after the vehicles have been used for approximately one year is in the regular business of a used car dealer for the purposes of imposing strict products liability. We reject the notion that HP's status as a seller for strict products liability purposes can be determined on the basis of any one factor alone. Thus, we disagree with Supreme Court's conclusion that HP's gross sales in excess of $50 million in 1984 and again in 1985 subject HP to strict products liability. We also find no merit in HP's argument that it can have no strict products liability because its sales of used vehicles are "incidental" to its business of manufacturing and selling computers, electronic equipment and medical equipment.

In *Sukljian v Ross & Son Co.* (69 NY2d 89, 97), the Court of Appeals held that a business which disposes of surplus equipment in an occasional sale has, at most, the duty to warn the purchaser of known defects that are not obvious or readily discernible. The court's refusal to impose strict products liability on the seller was not based upon the fact that equipment was used or surplus, but focused instead upon the absence of a "showing that General Electric was regularly engaged in the business of selling the equipment in issue" *(supra,* at 96). Accordingly, the fact that HP sold used vehicles, instead of new ones, does not in and of itself preclude imposition of strict products liability on HP *(see, Stiles v Batavia Atomic Horseshoes,* 174 AD2d 287).

■ In the *Sukljian* case, the court noted the absence of

regular, periodic dispositions of the equipment, a division devoted to selling that equipment, widespread advertising and substantial revenues from that activity *(Sukljian v Ross & Son Co., supra,* at 96-97). The transaction involved the sale of a single machine that had been in service for over 11 years and was sold for less than 1% of the seller's original purchase price *(supra,* at 96). In contrast, HP embarked upon a program in 1983 which had as its goal the eventual annual turnover of its domestic fleet of approximately 7,000 vehicles. The purpose of the program was to "streamline" administrative activities involved in the purchase and disposal of vehicles used by HP's employees, to take advantage of recent changes in tax and depreciation rules, and to exercise the purchasing power inherent in buying large numbers of vehicles from a single manufacturer. Pursuant to the program, HP disposed of the vehicles after they had about one year of service, while they still had substantial value and a substantial useful life. For example, the vehicle involved in this case was purchased by HP in late August 1983 for $9,732 plus sales tax. It was assigned to an HP employee who drove it for approximately one year. The vehicle was sold in January 1985, with approximately 33,000 miles on the odometer, for $5,300 or more than 50% of HP's original purchase price. There is nothing in the record to suggest that this transaction was not representative of HP's program as a whole. It is clear from all the relevant facts and circumstances that the sale was not merely the result of an occasional sale to dispose of surplus equipment, but was part of a business-related program designed to regularly dispose of vehicles used by HP employees when those vehicles still had substantial value and substantial useful life. In effect, HP was regularly involved in the chain of distribution whereby the vehicles moved from the manufacturer into the hands of the consumer, although HP's role was a rather complex one because it used the vehicles it purchased from the manufacturer before placing them in the marketplace.

Strict products liability should not be imposed upon a party whose role in placing the product in the stream of commerce is so peripheral to the manufacture and marketing of the product that it would not further the policy considerations which are the foundation for the imposition of this onerous liability on certain sellers *(Brumbaugh v CEJJ, Inc.,* 152 AD2d 69, 71; *see, Sukljian v Ross & Son Co., supra,* at 94-96). These policy considerations include the ability of the seller, because of its continuing relationship with the manufacturer, "to exert

pressure for the improved safety of products and [to] recover increased costs within their commercial dealings, or through contribution or indemnification in litigation; additionally, by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods" *(Sukljian v Ross & Son Co., supra,* at 95).

■ We are of the view that these policy considerations will be furthered by the imposition of strict products liability upon HP for its role in the regular distribution of used vehicles. HP itself has recognized the leverage generated by its purchases of large numbers of vehicles directly from the manufacturer, leverage which can be used to encourage improved safety as well as to obtain financial advantages. Additionally, HP can recover from the manufacturer for any strict products liability imposed on HP which is not the result of any active wrongdoing by HP *(see, supra).* It is also reasonable for the public to assume that vehicles which are used in HP's large fleet of vehicles and regularly disposed of at auctions to used car dealers for resale to the public after approximately one year of service will be well maintained and in good working condition. Based upon all of the relevant facts and circumstances which are undisputed, we conclude that HP is in the regular business of a used car dealer for the purpose of imposing strict products liability. HP is also a seller and a merchant within the meaning of UCC 2-103 (1) (d); 2-104 (1); 2-313 and 2-314.

■ Next, HP contends that the sole proximate cause of the accident was the Nuttings' continued use of the vehicle despite their knowledge of the stalling problem. We reject this argument, but the undisputed evidence requires dismissal of all causes of action against HP except the strict products liability claim based upon a manufacturing or design defect.

For the purposes of this appeal, we have accepted plaintiffs' allegations that, as a result of a defect in the engine operating system, the vehicle involved in the accident experienced intermittent malfunctions which caused the engine to stall, and that the accident happened when the vehicle drifted into the path of an oncoming vehicle while Nutting was attempting to cope with an engine stall, with its resulting loss of power, at highway speed. The Nuttings first experienced a stalling problem in April 1985, three months after they acquired the vehicle. Despite experiencing numerous instances of stalling over the next eight months, during a variety of driving conditions, including at highway speed, the Nuttings did not

have any repairs made, although they discussed the matter with a Ford dealer on one occasion. The Nuttings also learned in late May or early June 1985 that a consumer group had sought to have Ford recall 1984 and 1985 Mercury Marquis automobiles due to intermittent stalling problems. This undisputed evidence establishes, in our view, the absence of any causal relationship between the happening of the accident and the alleged wrongdoing on HP's part which may have affected the Nuttings' knowledge or belief when they acquired the vehicle *(see, Marte v Hickok Mfg. Co.,* 159 AD2d 316, 318; *Cramer v Toledo Scale Co.,* 158 AD2d 966, 967). The Nuttings' lack of knowledge of the defect at the time they bought the vehicle and their belief that they were purchasing a vehicle which was in good working condition played no part in the fact that Nutting was driving a defective vehicle on the date of the accident, for the Nuttings did not have the defect repaired and continued to drive the defective vehicle despite their actual knowledge of the stalling problem for some eight months prior to the accident. The Nuttings' claim that they would not have purchased the vehicle if they had known of the defect does not require a different conclusion. The purchase of the vehicle itself is too remote an event to have any causal connection to the accident.

Based upon the foregoing analysis, HP is entitled to summary judgment dismissing all claims against it which concern the Nuttings' knowledge or belief as to the condition of the vehicle when they purchased it. Accordingly, the negligence cause of action based upon failure to warn of the defect, the cause of action based upon breach of warranty,* and the punitive damages claim based upon HP's alleged reckless and fraudulent conduct concerning its representations as to the condition of the vehicle should be dismissed.

Turning to the strict products liability cause of action, a plaintiff may assert that a product is defective because of a mistake in the manufacturing process, because of an improper design or because of the inadequacy or absence of proper warnings regarding the use of the product *(Robinson v Reed-Prentice Div.,* 49 NY2d 471, 478-479). To the extent that plaintiffs' strict products liability cause of action is based upon

---

* Assuming that a breach of implied warranty claim could survive dismissal on the causation issue, we see no reason for its continued existence in this case. The basis for plaintiffs' claim is tortious conduct and, therefore, it "is more correctly treated under the theory of strict products liability" *(Micallef v Miehle Co.,* 39 NY2d 376, 387).

the latter theory, it is subject to dismissal on the causation issue for the reasons set forth above. Accordingly, we will focus on the manufacturing or design defect theories.

■ Proximate cause serves a somewhat different role in products liability cases than in ordinary negligence actions *(Voss v Black & Decker Mfg. Co.,* 59 NY2d 102, 110). To establish proximate cause in a products liability case, a plaintiff must show that the defect in the product was a substantial factor in causing the injury *(supra).* The evidence submitted by plaintiffs in support of their claim that the accident happened when the vehicle drifted into the path of an oncoming vehicle while Nutting was attempting to cope with a stalled engine at highway speed is clearly sufficient to create a question of fact on the necessary causal connection between the defect and plaintiffs' injuries. That causal connection was not automatically severed by the Nuttings' intervening conduct unless that conduct was, as a matter of law, extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from HP's conduct *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315). In the circumstances revealed by the evidence in the record, we cannot say that the Nuttings continued use of the vehicle with knowledge of the intermittent stalling condition met the standard of *Derdiarian v Felix Contr. Corp. (supra)* for an intervening cause as a matter of law *(compare, Knickerbocker v De Mars,* 147 AD2d 739, *lv denied* 74 NY2d 606, *with Mace v Ryder Truck Rental,* 55 AD2d 432, *revd on dissenting opns below* 43 NY2d 814). We view the Nuttings' conduct as nothing more than a third party's misuse or mishandling of a defective product which is "relevant for jury consideration on the issues of intervening cause and apportionment of fault" *(Sheppard v Smith Well Drilling & Water Sys.,* 93 AD2d 474, 478; *see, Voss v Black & Decker Mfg. Co.,* 59 NY2d 102, 110, n, *supra* [where the court noted that evidence of an injured plaintiff's misuse of a defective product was relevant at the trial of a strict products liability action on the issue of comparative fault]; *see also, Craft v Mid Is. Dept. Stores,* 112 AD2d 969, 971-972; *but see, Spooner v Sears, Roebuck & Co.,* 161 AD2d 103, *lv denied* 76 NY2d 712). We conclude, therefore, that as to the strict products liability cause of action, summary judgment on the issue of causation is inappropriate based upon the evidence in this record.

■■ The remaining issues concern HP's counterclaim for contribution against plaintiff Steven A. Nutting and its cross

claim for indemnification against Ford. Supreme Court dismissed the counterclaim based upon plaintiffs' release of Steven Nutting (General Obligations Law § 15-108 [b]). HP contends that in the absence of any evidence in the record to establish that the releases had received court approval, as required by CPLR 1207 and EPTL 5-4.6, Supreme Court erred in dismissing the counterclaim. Despite Supreme Court's involvement in the settlement of the claims involving the children, HP's argument appears to be correct. Nevertheless, HP was not prejudiced by the purely technical error. Plaintiffs concede that, pursuant to General Obligations Law § 15-108 (a), their claim against HP will be reduced by the amount stipulated in the release, the consideration paid for the release or Steven Nutting's proportionate share of the damages, whichever is greatest. Because HP cannot be liable to plaintiffs for any portion of the damages attributable to Steven Nutting's tortious conduct, we see no prejudice to HP in the dismissal of its counterclaim for contribution against Steven Nutting. As to Ford's argument that Supreme Court erred in denying Ford's motion to dismiss HP's cross claim against it for indemnification, HP's potential strict products liability for selling the allegedly defective vehicle gives it a cause of action for indemnification against Ford as the manufacturer responsible for the defect (see, McDermott v City of New York, 50 NY2d 211; cf., Rosado v Proctor & Schwartz, 66 NY2d 21).

The results of our analyses of these appeals can be summarized as follows. The evidence establishes as a matter of law that HP is in the regular business of selling used vehicles and, therefore, is subject to strict products liability for its sale of a vehicle with an alleged defective condition which was a substantial factor in the happening of the accident. HP's alleged wrongful conduct based upon the failure to warn of the defect, misrepresentation of the condition of the vehicle and breach of warranty was, as a matter of law, not a proximate cause of the accident because the Nuttings' knowledge and belief as to the condition of the vehicle when they purchased it had nothing to do with the happening of the accident nearly a year later and some eight months after they learned of the defective condition. The Nuttings' continued use of the vehicle without having the defective condition repaired is not sufficient to establish an intervening cause as a matter of law and relieve HP of any strict products liability, but the Nuttings' conduct does raise a factual question as to intervening cause and apportionment of liability. HP has no cause of action for

contribution against Steven Nutting, but it does have a cause of action for indemnification against Ford.

WEISS, P. J., CREW III, MAHONEY and HARVEY, JJ., concur.

Ordered that the order is modified, on the law, without costs, by deleting from the third decretal paragraph the phrase "in all respects denied" and substituting therefor the phrase "granted as to the first, second, fifth and sixth causes of action in plaintiffs' complaint against defendant Hewlett-Packard Company and otherwise denied", and by deleting the seventh decretal paragraph, and, as so modified, affirmed.