Jorge **GONZALEZ**, Plaintiff,

v.

**RUTHERFORD CORP.**, Defendant.

**RUTHERFORD CORP.**, Third–Party Plaintiff,

v.

**CLEVELAND CRANE AND ENGINEERING CO.**, Daley–Hodkin Corp., Pyramid Equipment Leasing Corp., and Capital Steel Fabrication, Inc., Third–Party Defendants.

No. CV 91–4534(RR).

United States District Court, E.D. New York.

March 31, 1995.

---

Trolman & Glaser, P.C. by Gary P. Deutschmeister, New York City, for plaintiff.

Quirk and Bakalor, P.C. by Timothy Keane, New York City, for Rutherford Corp.

Myles R. Elber by Mark Baribault, Brooklyn, NY, for Daley–Hodkin Corp.

Conway, Farrell, O'Connor, Curtain & Kelly, P.C. Kristin G. Shea, New York City, for Pyramid Equipment Leasing Corp.

## MEMORANDUM and ORDER

RAGGI, District Judge:

Plaintiff Jorge Gonzalez, a New York resident, invokes this court's diversity jurisdiction to sue Rutherford Corporation, a used machinery dealer located in New Jersey, for injuries sustained while working with a press brake sold by Rutherford to Gonzalez's employer, Capital Steel Fabrication, Inc. Plaintiff's complaint alleges causes of action in strict liability, breach of express and implied warranties, and negligence. Rutherford, in turn, has filed a third-party complaint seeking contribution and/or indemnification from (1) Capital Steel Fabrication, (2) Cleveland Crane and Engineering Co., the manufacturer of the press [1], (3) Daley–Hodkin Corporation, the auctioneer from which Rutherford purchased the press brake, and (4) Pyramid Equipment Leasing Corporation, a finance lessor involved in the transfer of the press brake from Rutherford to Capital Steel Fabrication.

Now pending before the court are Rutherford's motion for summary judgment against Gonzalez and the motions of third-party defendants Daley–Hodkin and Pyramid Equipment Leasing for summary judgment against Rutherford. Having carefully considered the submissions of the parties, and having heard oral argument, the court hereby grants Rutherford's motion for summary judgment as to plaintiff's claim of express warranty, but denies the motion in all other respects. It grants the motions of Daley–Hodkin and Pyramid Equipment Leasing and enters summary judgment in their favor on Rutherford's third-party claim.

### Factual Background

Most facts relevant to the motions before this court are not in dispute. To the extent they are, the court views the evidence in the light most favorable to the non-movant on each motion.

At the times relevant to this dispute, Jorge Gonzalez was an employee of Capital Steel Fabrication in Brooklyn, New York. On August 6, 1991, Gonzalez was working a Steelweld mechanical press brake, model number I-4-8, serial number M 3235, a machine used for stamping and puncturing metal. The press brake contained a long vertically movable cutting instrument, called a ram, which would descend onto a point of operation, or bed. The ram could be activated either manually by twin buttons on either side of the machine front plate or by use of a foot pedal. Gonzalez asserts that, while sitting in front of the machine, he at one point leaned forward to better see a metal sheet he was position-

1. This defendant has apparently ceased doing business and has not been served in the action.

ing with his right hand on the cutting plane. In the process, he inadvertently stepped on the foot pedal, activating the ram. The ram crushed and partially amputated parts of four fingers on Gonzalez's right hand.

On November 20, 1991, plaintiff commenced this lawsuit. He contends that the press brake was defectively designed in that it had no foot pedal guards, point of operation safety system, or hand tools for use at the point of operation. He submits that Rutherford is strictly liable for these defects and the failure to warn of them. He further asserts that Rutherford's conduct was negligent and a breach of express and implied warranties.

The Steelweld press brake involved in the Gonzalez accident was originally manufactured sometime during the 1950's by Cleveland Crane and Engineering Co. It eventually became the property of a Massachusetts business, ATF–Davidson Company, Inc. When ATF–Davidson declared bankruptcy, its property was sold for the benefit of creditors, including the Bank of New York. To effect the sale of assets, the Bank of New York hired Daley–Hodkin to conduct a bankruptcy auction. Among the assets thus offered for sale in April 1990 were over three-thousand separate lots of personal property—including the Steelweld press brake—and over one hundred forty acres of real property. All bidders were advised that the property was being sold "as is/where is," without any warranties as to quality or merchantability. It is undisputed that Daley–Hodkin made no modifications or repairs to any of the property offered for sale. Rutherford was the successful bidder for the press brake, paying $11,000.

For close to twenty years, Rutherford has bought and sold used metal working machine tools. It stores and shows its inventory—which has included over one hundred different types of machines manufactured by over twenty-five businesses—at a 10,000 square foot warehouse in Linden, New Jersey. It advertises in various trade magazines, including "Used Equipment Directory," specifically

aimed at the used machinery market. It does not dispute that it is a regular dealer in used goods.

Sometime in late 1990, Rutherford's salesman, Frank Sangiorgi, discussed with representatives of Capital Steel Fabrication that company's interest in purchasing a press brake. Alain Blaier, the Vice President of Capital Steel Fabrication, and his father went to Rutherford's warehouse to see the Steelweld press brake here at issue. To meet the $30,000 purchase price, Capital Steel Fabrication explored financing with Pyramid Equipment Leasing. As a result, Pyramid Equipment Leasing formally purchased the press brake from Rutherford on November 26, 1990, arranging for shipment directly to Capital Steel Fabrication.[2]

The invoice relating to this sale states that the machinery is sold by Rutherford with "no warranties express or implied." A similar disclaimer is noted on the bill of sale. The invoice further purports to obligate the "[b]uyer ... to inspect All Machinery On A Continuing Basis, [and] to Provide Proper Safety Devices and Equipment or Means Necessary to Safeguard the Operator from Harm For Any Particular Use, Operation or Set-up of Machines." Finally, the invoice contains an indemnification clause whereby,

> Buyer agrees to indemnify and hold seller harmless from ... (4) any liability, loss or damages, claims, demands, costs or judgments based upon or resulting from any legal theory of strict liability or liability without fault applied to buyer or to seller or to the original manufacturer of the subject machinery or equipment to seller or (5) any liability, loss or damages, claims, demands, costs or judgments based upon or resulting from any theory of breach of warranty of any kind.

Apparently, this document was never signed by any representative of Pyramid Equipment Leasing or Rutherford.

Although Pyramid Equipment Leasing is listed as the "buyer" on the relevant sales documents, it is undisputed that it never had

---

**2.** At the same time, Pyramid Equipment Leasing purchased a Westinghouse air compressor for $5,000, which was also shipped directly to Capi-

tal Steel Fabrication, resulting in a total invoice of $35,000.

possession of the Steelweld press brake. An equipment lease dated November 27, 1990 provided for Capital Steel Fabrication to pay Pyramid Equipment Leasing a "monthly rental" of $845.25 for the press brake over sixty months, with an option to purchase the machine for $1.00 at the expiration of the lease. This lease was assigned to Apple Acceptance Corporation on the same day, and it was that business that both paid Rutherford and received lease payments from Capital Steel Fabrication.

*Discussion*

### I. *Summary Judgment*

It is well-established that summary judgment is appropriate only when there are no genuine issues of material fact requiring resolution at trial, and when the law supports the moving party. Fed.R.Civ.P. 56(c); *e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Turtur v. Rothschild Registry Intern.,* 26 F.3d 304, 309 (2d Cir.1994). The movant bears the initial burden of demonstrating the absence of any genuine issue of fact. *Turtur v. Rothschild Registry Intern.,* 26 F.3d at 309. A party opposing summary judgment cannot rely on hypothetical speculation or metaphysical musings to create an issue of fact. Rather, it must point to specific evidence that, if credited, would support a jury verdict in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If such evidence is adduced, the weight to accord it, and the resolution of any factual differences between the parties must be left for the jury to determine. This is because a court's sole task is to decide whether genuine factual issues are present, not to weigh the evidence or resolve the dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Turtur v. Rothschild Registry Intern.,* 26 F.3d at 309.

### II. *Choice of Law*

A federal court sitting in diversity applies the same choice of law rules as the state in which it sits. *Klaxon v. Stentor,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Banker v. Nighswander, Martin & Mitchell,* 37 F.3d 866, 871 (2d Cir.1994). In personal injury actions, New York generally applies its own law to injuries occurring in this state. *E.g., Cooney v. Osgood Machinery, Inc.,* 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). All parties agree that New York law applies to this case.

### III. *Rutherford's Motions Against Gonzalez*

#### A. *Strict Liability*

Rutherford moves for summary judgment in its favor on Gonzalez's strict liability claim, arguing that, under New York law, strict products liability does not apply to used machinery dealers. The legal issue is by no means easily resolved. Generally, this court would look first to New York's ultimate authority, its Court of Appeals, to ascertain controlling state law. *See Sphere Drake Ins. Co. v. P.B.L. Entertainment, Inc.,* 30 F.3d 21, 22 (1994). But that court has not yet ruled on whether regular dealers in used machinery, such as Rutherford, should be held strictly liable for defects in the products they sell. In the absence of any plain ruling by the Court of Appeals, the state law rulings of the Appellate Divisions "are entitled to 'persuasive, if not decisive, consideration.'" *Id.* at 23 (quoting *In re Eastern and Southern Districts Asbestos Litigation,* 772 F.Supp. 1380, 1389 (E. & S.D.N.Y.1991)). Indeed, a federal court is generally obliged to follow the decisions of a state's intermediate courts absent "'convincing evidence that the [New York Court of Appeals] would decide differently.'" *Id.* (quoting *Stoner v. New York Life Ins. Co.,* 311 U.S. 464, 467, 61 S.Ct. 336, 338, 85 L.Ed. 284 (1940)); *Pentech Intern., Inc. v. Wall Street Clearing Co.,* 983 F.2d 441, 445–46 (2d Cir.1993). Appellate Division decisions do not, however, speak unequivocally to the facts of this case. Where state law is uncertain or ambiguous, a federal court must "endeavor to predict how the highest court of the state" would resolve the issue. *U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.,* 38 F.3d 1289, 1296 (2d Cir.1994). Such a task requires a careful review of various

resources, including "relevant cases from jurisdictions other than New York in an effort to predict '[w]hat would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York "jurisprudence".'" *Travelers Ins. Co. v. 633 Third Assoc.*, 14 F.3d 114, 119 (2d Cir.1994) (quoting *Cooper v. American Airlines*, 149 F.2d 355, 359 (2d Cir.1945)). In fact, state courts are divided in their application of strict liability to used products dealers.

Of course, serious public policy concerns are always present when the scope of strict liability is being defined. Because such policy questions are generally best resolved directly by the state courts, this court has urged the parties to transfer their claim to New York court. They have not agreed to do this. Although New York does entertain certification of determinative questions of state law to its Court of Appeals, even without the consent of the parties, it requires that such certification be made by the Supreme Court of the United States or by a federal Court of Appeals, and not simply by a district court. N.Y.Rules of Court § 500.17 (McKinney's 1995). The parties having thus chosen to remain in this forum, and this court being without power to certify the question to the New York Court of Appeals, it must do its best to "predict" whether that Court of Appeals will apply strict liability to regular dealers in used machinery in circumstances such as are presented in this case.

### 1. *Court of Appeals Decisions*

■ New York's Court of Appeals has made plain that an action for strict products liability will not lie against a "casual or occasional seller" of used equipment. *Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 95, 511 N.Y.S.2d 821, 824, 503 N.E.2d 1358, 1360–61 (1986). Plaintiff in that case had injured his hand while cleaning a high speed grinding mill. The machine in question was first purchased in 1962 by the General Electric Corporation. Eleven years later, General Electric sold the machine at a surplus equipment sale. It conducted two to three such sales a year. The terms of the sale were "as is, where is," with an express disclaimer of warranty. The mill, which had originally cost General Electric $4,000, was sold to Semco Equipment for $35. Semco sold the machine a few weeks later for $150 to a dealer in new and used machinery, which soon thereafter sold it to another such dealer. Over the course of the next two years, the mill was reconditioned and rebuilt and, in 1976, was sold to plaintiff's employer. General Electric was not sued by plaintiff for the damages he sustained. Rather, it was named as a third-party defendant. It moved for summary judgment on the grounds that it did not sell the machinery in the ordinary course of business and, therefore, owed no duty to plaintiff. Both the trial court and the Appellate Division granted the motion as to the strict liability claim against General Electric. The Court of Appeals affirmed, holding that "[b]oth Special Term and the Appellate Division correctly concluded that strict liability was inapposite because there was no showing that General Electric was *regularly* engaged in the business of selling the equipment in issue." *Id.* at 96, 511 N.Y.S.2d at 824, 503 N.E.2d at 1361 (emphasis added). It explained:

> The policy considerations that have been advanced to justify the imposition of strict liability on manufacturers and sellers in the normal course of business obviously lack applicability in the case of a party who is not engaged in the sale of the product in issue as a regular part of its business. (*See,* Restatement [Second] of Torts § 402 A, comment f, concluding: "This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.") The casual or occasional seller of a product does not undertake the special responsibility for public safety assumed by those in the business of regularly supplying those products, nor is there the corollary element of forced reliance on that undertaking by purchasers of such goods. As a practical matter, the occasional seller has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the public consumer does not

have the same expectation when it buys from such a seller.

*Id.* at 95–6, 511 N.Y.S.2d at 823–24, 503 N.E.2d at 1360–61. The decision plainly left open the question of whether strict products liability would apply to *regular* dealers in used products such as Rutherford.

That issue was presented in *Stiles v. Batavia Atomic Horseshoes, Inc.,* 81 N.Y.2d 950, 597 N.Y.S.2d 666, 613 N.E.2d 572 (1993). In *Stiles,* plaintiff's hands were crushed by a 56-ton punch press that its employer had purchased from Batavia Atomic Horseshoes, a small manufacturer of horseshoes that also engaged in buying and selling used industrial machinery. Batavia had purchased the press in question at an auction and promptly sold it to plaintiff's employer. This was one of three occasions over the two years it was in business that Batavia bought and resold used machinery. The trial court asked the jury to respond to a specific interrogatory: "At the time of the sale of the punch press was Batavia Atomic Horseshoes engaged in the sale of used punch presses as a regular part of its business?" The jury unanimously found that it was, and proceeded to hold defendant liable. *Stiles v. Batavia Atomic Horseshoes, Inc.,* 174 A.D.2d 287, 290, 579 N.Y.S.2d 790, 792 (4th Dep't 1992).

The Appellate Division affirmed, holding both that the answer to the interrogatory was adequately supported by the evidence and that regular dealers in used products are subject to strict liability. *Id.* at 290–91, 579 N.Y.S.2d at 792–93. In reaching the latter conclusion, the unanimous five-member court noted that a number of other states had imposed strict liability on used products dealers because, "like sellers of new products, [they] have assumed a special responsibility to the public, [they] may spread the loss caused by defective products and [they] have the ability and knowledge to remove defects before placing the used product in the distribution chain." *Id.* at 291, 579 N.Y.S.2d at 793. Moreover, such a conclusion was consistent with section 402A of the Restatement (Second) of Torts. *Id.*[3] The Fourth Department acknowledged that the Court of Appeals had not specifically adopted section 402A as a statement of New York law. *Id.* at 291, n. 1, 579 N.Y.S.2d at 793, n. 1; *see Micallef v. Miehle Co., Div. of Miehle–Goss Dexter, Inc.,* 39 N.Y.2d 376, 387–88, 384 N.Y.S.2d 115, 122, 348 N.E.2d 571, 578–79 (1976) (in which Judge Cook noted that, although he and Judge Fuchsberg favored adoption of section 402A as a statement of strict liability, a majority of the Court was not prepared to join them). Nevertheless, it noted that the Court of Appeals had referred approvingly to the section in cases involving strict products liability, thereby warranting reliance on it. *Stiles v. Batavia Atomic Horseshoes, Inc.,* 174 A.D.2d at 291, n. 1, 579 N.Y.S.2d at 793, n. 1; *see, e.g., Robinson v. Reed–Prentice Div. of Package Mach. Co.,* 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 442–43 (1980); *accord Sukljian v. Charles Ross & Son Co. Inc.,* 69 N.Y.2d at 95, 511 N.Y.S.2d at 823–24, 503 N.E.2d at 1359–62. Finally, the Fourth Department held that "the imposition of strict liability upon sellers of used products" would promote the salutary result of "increased maintenance and inspection" of used goods before they are returned to the stream of commerce. *Stiles v. Batavia Atomic Horseshoes, Inc.,* 174 A.D.2d at 291, 579 N.Y.S.2d at 793.

The Court of Appeals, in a memorandum opinion, reversed, holding that the evidence in the record was insufficient "to support the

---

**3.** Section 402A of the Restatement (Second) of Torts (1965), titled "Special Liability of Seller of Product for Physical Harm to User or Consumer," states:

  (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

  (a) the seller is engaged in the business of selling such a product, and

  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

  (2) The rule stated in Subsection (1) applies although

  (a) the seller has exercised all possible care in the preparation and sale of his product, and

  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

jury's finding that Batavia engaged in sales of equipment as a 'regular part of its business.'" *Stiles v. Batavia Atomic Horseshoes, Inc.*, 81 N.Y.2d at 951, 597 N.Y.S.2d at 667, 613 N.E.2d at 573. In light of that ruling, the Court of Appeals concluded that it "need not reach the question reserved in *Sukljian* and submitted by the parties to this appeal, i.e., whether the doctrine of strict products liability applies to regular sellers of used goods." *Id.*

2. *Appellate Division Holdings*

There are few Appellate Division holdings that address the question of whether a regular—as opposed to occasional—dealer in used products can be sued in strict liability. The Third Department, which originally heard the *Sukljian* case, did suggest therein that public policy might not support the application of strict liability to *any* used products dealer.

The policy considerations justifying extension of strict tort liability to sales of new products by commercial dealers do not apply with equal force to sales of used products. Obviously such a dealer, as distinguished from one who sells new products, would have great difficulty in passing on the burden of liability to the original manufacturer whose conduct may have been responsible for the defect.

*Sukljian v. Charles Ross & Son Co., Inc.*, 116 A.D.2d 9, 11–12, 499 N.Y.S.2d 466, 468 (3d Dep't 1986).

That, of course, was not the view of the Fourth Department in *Stiles*. As already noted, *supra*, that court cited various policy reasons for applying strict liability to all regular dealers in used products, including (1) the special responsibility assumed by such regular dealers to the public; (2) the ability of such dealers to spread the loss caused by defective used products; (3) the knowledge and ability of such dealers to remove defects before placing used products in the distribution chain; (4) the salutary benefits of encouraging used dealers to increase their maintenance and inspection of used products; and (5) the broad applicability of section 402(A) of the Restatement to sellers of all defective products, whether new or used. *Stiles v. Batavia Atomic Horseshoes, Inc.*,

174 A.D.2d at 290–91, 579 N.Y.S.2d at 793. Certainly, these reasons would support application of strict liability to Rutherford in this case.

Since the Court of Appeals ruling in *Sukljian*, the Third Department has also held that where a defendant "is in the regular business of selling used [products,]" and where a defect in such product is a "substantial factor" in the happening of an accident, the dealer "is subject to strict products liability." *Nutting v. Ford Motor Co.*, 180 A.D.2d 122, 133, 584 N.Y.S.2d 653, 659 (3d Dep't 1992).

*Nutting* involved a fatal automobile accident that occurred when an engine stalled in a Mercury Marquis station wagon. The automobile had been purchased new by Hewlett–Packard Company in August 1983 as part of a fleet of some 3,290 new vehicles acquired that year from Ford Motor Company for use by Hewlett–Packard employees. That same year, Hewlett–Packard embarked on a program whereby it annually turned over its fleet of company automobiles. Pursuant to this program, Hewlett–Packard sold the automobile involved in the *Nutting* accident at auction in January 1985 to Hi–Way Motors, a used car business, which in turn transferred title to the Nuttings.

Relying on *Sukljian*, Hewlett–Packard sought summary judgment on the grounds that it was not a regular seller of used automobiles. The Appellate Division disagreed:

[O]ne who regularly purchases a substantial quantity of new cars for use by its employees and who regularly disposes of those vehicles by auction sales to used car dealers for resale to the public after the vehicles have been used for approximately one year is in the regular business of a used car dealer for the purposes of imposing strict products liability.

*Id.* at 127, 584 N.Y.S.2d at 656. Thus, the court specifically rejected Hewlett–Packard's argument that a dealer in used goods could never be held liable in strict liability. It explained:

The [Court of Appeal's] refusal [in *Sukljian* ] to impose strict products liability on the seller was not based upon the fact that

equipment was used or surplus, but focused instead upon the absence of a "showing that General Electric was regularly engaged in the business of selling the equipment in issue." Accordingly, the fact that [Hewlett–Packard] sold used vehicles, instead of new ones, does not in and of itself preclude imposition of strict products liability on [Hewlett–Packard].

*Id.* (citations omitted).

While it thus appears clear that the Third Department now joins the Fourth in recognizing a cause of action for strict liability against regular dealers in used products, this court does note that the policy considerations cited in support of the *Nutting* ruling are narrower than those relied on by the intermediate court in *Stiles.* The *Nutting* court highlighted the fact that the used product seller in that case, Hewlett–Packard, had purchased its cars directly from the manufacturer and had an ongoing relationship with Ford. As such it was "involved in the chain of distribution whereby the vehicles moved from the manufacturer into the hands of the consumer...." *Nutting v. Ford Motor Co.,* 180 A.D.2d at 128, 584 N.Y.S.2d at 657. Thus, Hewlett–Packard could exert pressure on the manufacturer to improve the safety of its product. Indeed, it could itself recover from the manufacturer for any liability judgment. Moreover, it was reasonable for the public to assume that cars actually used by Hewlett–Packard and sold after only one year were well maintained and in good condition. *Id.* at 129, 584 N.Y.S.2d at 657. Under these facts, the *Nutting* court concluded that extension of strict products liability to Hewlett–Packard was consistent with the policy considerations articulated by the Court of Appeals in *Sukljian.* Therein, it was noted:

Where products are sold in the normal course of business, sellers, by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation; additionally, by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods.

*Sukljian v. Charles Ross & Son Co., Inc.,* 69 N.Y.2d at 95, 511 N.Y.S.2d at 823, 503 N.E.2d at 1360.

As defendant Rutherford submits, very few regular dealers in used products have any relationships with manufacturers. They generally acquire products after they have passed through a number of hands and, in some cases, including this one, after the original manufacturer has gone out of business.

Thus, while two Appellate Division courts concur that strict liability can apply to regular dealers in used products, their different rationales create an ambiguity as to whether New York would extend such liability to Rutherford, which, although a regular used products dealer, has had no relationship with the original manufacturer.

### 3. *Decisions in Other Jurisdictions*

■ In attempting to "predict" how New York would resolve the question of strict liability in this case, this court is mindful that it deals with a common law principle only a little more than thirty years old. *See* Tracey A. Batemann, Annotation, *Products Liability: Application of Strict Liability Doctrine to Seller of Used Product,* 9 A.L.R.5th 1, 14 (1993) (hereinafter "Batemann, *Products Liability*") (strict liability first applied in *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1963)). It is a principle that does not depend upon fault, or foreseeability of injury, or even privity with the injured party. *See Sukljian v. Charles Ross & Son Co., Inc.,* 69 N.Y.2d at 94–95, 511 N.Y.S.2d at 823, 503 N.E.2d at 1359–60. It depends instead on a public policy determination that a defendant (whether a manufacturer, distributor, or seller) who puts into the market a product with a safety defect (whether in manufacture, design, or warning) shall be held liable for any injury caused by the defect. *Id.* The parameters of strict liability in light of the policy concerns defining it are still being explored by the courts, as is demonstrated by the New York Court of Appeals' acknowledgment that certain questions, specifically the one presently before this court, are yet to

be answered. *Stiles v. Batavia Atomic Horseshoes, Inc.*, 81 N.Y.2d at 951, 597 N.Y.S.2d at 667, 613 N.E.2d at 573.

Since, as a matter of routine, state courts look to one another in defining common law principles, this court has considered the opinions of jurisdictions other than New York that have addressed the application of strict liability to regular dealers in used products. *See* Batemann, *Products Liability*, 9 A.L.R.5th 1 *passim* (surveying law in jurisdictions throughout country). No consensus emerges.

Some courts have declined to permit actions for strict liability when an alleged defect did not originate with the manufacturer and was not created by the used dealer. As the Supreme Court of Illinois explained in *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785 (1975), any other holding would make the used dealer "an insurer against defects which had come into existence after the chain of distribution was completed, and while the product was under the control of one or more consumers." *Id.* at 21, 329 N.E.2d at 787; *accord Grimes v. Axtell Ford Lincoln–Mercury*, 403 N.W.2d 781 (Iowa 1987).

In several cases, California courts have held that sellers of used machinery are not strictly liable in tort for manufacturers' defects unless they rebuild or modify the machine or make representations as to quality or durability. *E.g., Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (Cal.Ct.App. 1981); *LaRosa v. Superior Court*, 122 Cal. App.3d 741, 176 Cal.Rptr. 224 (Cal.Ct.App. 1981); *Tauber–Arons Auctioneers Co., Inc. v. Superior Court*, 101 Cal.App.3d 268, 161 Cal.Rptr. 789 (Cal.Ct.App.1980). This logic has been followed in other jurisdictions. *Harber v. Altec Industries, Inc.*, 5 F.3d 339 (8th Cir.1993) (applying Missouri law); *Kodiak Electric Ass'n, Inc. v. DeLaval Turbine, Inc.*, 694 P.2d 150 (Alaska 1984); *Snell v. Bertsch & Co., Inc.*, 577 F.Supp. 1393 (D.Kan.1984) (applying Kansas law); *Crandell v. Larkin and Jones Appliance Co., Inc.*, 334 N.W.2d 31 (S.D.1983).

But New Jersey, the state where Rutherford maintains its principal place of business, does impose strict liability on regular dealers in used products without regard to any modifications or representations they may make. The issue was first addressed in *Turner v. Intern. Harvester Co.*, 133 N.J. Super 277, 336 A.2d 62 (Sup.Ct.1975). Although this is not a decision of the state's highest court, *Turner* is cited throughout the country for its thoughtful analysis of the issue. Indeed, it was cited approvingly by the Fourth Department in *Stiles v. Batavia Atomic Horseshoes, Inc.*, 174 A.D.2d at 290, 579 N.Y.S.2d at 793.

In *Turner*, a used car dealer was held liable in strict liability for the fatal injuries suffered when the cab of a used truck suddenly collapsed and fell on the buyer. The court explained that, just as a manufacturer of new goods bases his cost on his expenses, including possible "damages caused by the product and insurance to cover those damages," so sellers of used goods "may similarly distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods." *Id.* at 289, 336 A.2d at 69. The court acknowledged that a buyer's "realistic expectations of quality and durability will be lower for used goods [than for new], commensurate with their age, appearance and price." *Id.* For that reason, a buyer could not complain if a used product did not last as long as a new one or needed replacement parts more often. *Id.* But, in the court's view, a proper concern for the "safety of the general public" nevertheless demanded that, when a used product is sold as serviceable, the seller be strictly liable for injuries caused by latent safety defects.

> Otherwise the buyer and the general public are bearing the enterprise liability stemming from the introduction of the dangerously defective [product] . . . Public policy demands that the buyer receive a used chattel safe for the purpose intended.

*Id.*

The Texas Supreme Court has adopted "enterprise liability" as the principal rationale for imposition of strict products liability. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 425, 432 (Tex.1984). Relying on

*Duncan,* the Fifth Circuit, in *Galindo v. Precision American Corp.,* 754 F.2d 1212 (5th Cir.1985), held that a corporation that sold obsolete equipment causing plaintiff's injury could be accountable in strict liability under Texas law if it was regularly engaged in such equipment sales. Similarly, in *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex.Civ.App.1975), an intermediate Texas court held that a defendant who sold bricks in a defective condition unreasonably dangerous to the consumer could be liable in strict liability.

The Supreme Court of Oregon, however, has criticized what it perceives to be undue reliance on "enterprise liability" as the basis for applying strict liability to used products dealers. *Tillman v. Vance Equipment Co.,* 286 Or. 747, 753, 596 P.2d 1299, 1303 (1979). In that widely-cited case, the court held that, while ability to spread the risk is a relevant factor in strict liability analysis, the reasonable expectations of the purchaser or user, and the impetus thereby given manufacturers to develop better products must also be considered. *Id.* at 753–54, 596 P.2d at 1303. In the court's view, the last two factors did not sufficiently support application of strict liability to a used equipment dealer who sold a crane to the employer of the injured plaintiff. The court's conclusion that purchasers of used goods had no justifiable expectation of safety was based on its view of the workings of secondary markets.

> Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale.

*Id.* at 755, 596 P.2d at 1303.

The court further concluded that application of strict liability to used product dealers would provide no significant impetus to manufacturers to produce safer goods.

> The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.

In theory, a dealer in used goods who is held liable for injuries caused by a design defect or manufacturing flaw could obtain indemnity from the manufacturer.... We believe, however, that the influence of this possibility as a practical factor in risk prevention is considerably diluted where used goods are involved due to such problems as statutes of limitation and the increasing difficulty as time passes of locating a still existing and solvent manufacturer.

*Id.* at 756, 596 P.2d at 1304.

By contrast, Wisconsin's Supreme Court, considering the same three policy rationales as Oregon, has held that used products dealers should be strictly liable for injuries stemming from latent defects. *Nelson v. Nelson Hardware, Inc.,* 160 Wis.2d 689, 467 N.W.2d 518 (1991). In *Nelson,* a young boy injured his hand when a shotgun, purchased used from defendant's hardware store, accidentally discharged when it fell onto a barn floor. The Wisconsin court, like its Oregon counterpart, concluded that used products dealers were capable of spreading the risk for injuries attributable to any defective products sold by them. *Id.* at 704–05, n. 5, 467 N.W.2d at 524, n. 5. But it also thought that the other two pertinent factors, reasonable purchaser expectations and risk reduction, were sufficiently implicated in the case before it to apply strict liability. The first conclusion was fact specific:

> [T]here is evidence that the defective safety mechanism belied the reasonable expectations of the user in that the gun "will unexpectedly fire when dropped on the butt from a distance of only ten inches while uncocked and in the safety mode."

*Id.* (quoting from expert report). This distinguished the case from an earlier one heard by the Wisconsin Supreme Court, *Burrows v. Follett & Leach, Inc.,* 115 Wis.2d 272, 340 N.W.2d 485 (1983), in which strict liability was not applied to the seller of a used machine. Because the "defect in the *Burrows* machine was in 'plain view' and '[t]he dangers of a rapidly rotating drive shaft are obvious and well known,'" there simply was no latent defect contrary to a consumer's reasonable expectations. *Nelson v. Nelson Hardware, Inc.,* 160 Wis.2d at 699, 467

N.W.2d at 522 (quoting *Burrows v. Follett & Leach, Inc.,* 115 Wis.2d at 285, 340 N.W.2d 485).[4]

The court's conclusion as to the final policy factor was more general:

> [A]lthough the chances of indemnity from a manufacturer may be diluted in the case of used goods due to the passage of time, a manufacturer would continue to be liable on an indemnification theory, which would create an impetus to manufacture a safer product.

*Id.* at 705, n. 5, 467 N.W.2d at 524, n. 5.

The Wisconsin court elsewhere made plain that, in any event, it did not consider the third factor critical when applied to the sellers of defective products, new or used, for reasons derived from section 402A of the Restatement.

> While there is an incremental benefit in terms of public policy by conceivably correcting manufacturers' errors, that additional point is almost irrelevant, when viewed from a plaintiff's point of view, to the imposition of strict liability on one who sells a dangerously defective product to a consumer.
>
> Strict products liability is imposed upon manufacturers without regard to their care in producing goods. It is enough under sec. 402A that a product in a defective condition unreasonably dangerous to a user or consumer has been put into the stream of commerce. It is obviously satisfying to society's sense of rectitude to hold liable the manufacturer, the party responsible for the defect, but a seller is held responsible on an entirely different rationale. A seller is liable even though completely innocent or completely uninvolved in creating the defect. *See* sec. 402A Restatement, Comment c, page 349, which sets forth the policy reasons why a seller is appropriately held responsible in strict liability irrespective of any relation to a man-

ufacturer and quite apart from any common law theories of indemnity.

*Id.* at 706, n. 6, 467 N.W.2d at 524, n. 6.

The Wisconsin court recognized that section 402A does not explicitly refer to dealers in used products. Nevertheless, it found the language of the section so broad as necessarily to include them.

> The words employed are "(1) One who sells any product...." It is thus apparent that any seller "if ... engaged in the business of selling such a product,"—any product—is included. There are no exclusions based upon whether the product has previously been sold to a consumer.

*Id.* at 702–03, 467 N.W.2d at 523.

Indeed, further support for applying strict liability to regular dealers in used products can be found in commentary to section 402A, which distinguishes between occasional and regular sellers of products, without regard to whether the products sold are old or new.

> The basis for the rule [of strict liability] is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence.

Restatement (Second) of Torts § 402A cmt. f. By contrast, the law assumes a special responsibility on the part of regular commercial sellers to offer products for public consumption that do not contain latent safety defects.

### 4. *The Application of Strict Products Liability to Rutherford*

■ Having given careful consideration to the available authorities, this court concludes that New York would permit plaintiff to sue Rutherford for strict products liability

---

4. Rutherford submits that the defects alleged by plaintiff were so obvious as make this case more akin to *Burrows* than *Nelson.* In fact, a liberal reading of the parties' submissions precludes this court from finding, as a matter of law, that the defects here at issue were obvious. This is discussed in detail *infra* in addressing plaintiff's negligent failure to warn claim.

in this case. Plainly, since Rutherford deals regularly in used products, it does not come within the *Sukljian* exception for occasional sellers. Nevertheless, Rutherford argues that even a regular dealer in used products should not be liable in strict liability absent evidence that (1) it reconditioned or remodeled the product sold; (2) it made representations as to its quality; or (3) it has an ongoing relation with the manufacturer. While the presence of any one of these facts would certainly make the court's conclusion even easier to reach (as was the case in *Nutting v. Ford Motor Co, supra*, where Hewlett–Packard, as a regular purchaser of Ford Motor vehicles, could exert commercial pressure and bring suit against the manufacturer), it does not find their absence determinative.

■ Defendant is correct in noting that New York has always referred to a seller's ability to exert pressure on a manufacturer for a safer product as a basis for imposing strict liability. *Sukljian v. Charles Ross & Co., Inc.* 69 N.Y.2d at 95, 511 N.Y.S.2d at 823–24, 503 N.E.2d at 1360. But as the Wisconsin court noted in *Nelson v. Nelson Hardware, Inc.*, 160 Wis.2d at 705–06, n. 6, 467 N.W.2d at 524, n. 6, this is an assumption drawn from the earliest days of strict liability to justify its extension to sellers who were in no way responsible for the defect causing a plaintiff's injury. New York has not, however, limited the liability of sellers of new products to those cases in which they have ongoing relationships with manufacturers. Indeed, a seller could not escape strict liability in New York on a simple showing that the manufacturer had gone out of business or was not available to provide indemnification. Because there is no principled reason to hold sellers of *new* products strictly liable for manufacturer's defects regardless of any actual ability to sue or otherwise put pressure on the manufacturer, but to hold sellers of *used* products strictly liable only if they maintain an ongoing relationship with the

manufacturer, this court does not think that New York will fashion a strict liability rule that treats these two categories of regular sellers of products differently.[5]

What must be recognized is the broader principle cited in New York cases as a reason for extending strict liability to regular commercial sellers: the "special responsibility to the public" assumed by such sellers "to stand behind their goods." *E.g., Sukljian v. Charles Ross & Co, Inc.*, 69 N.Y.2d at 95, 511 N.Y.S.2d at 823, 503 N.E.2d at 1359–60.

Defendant submits that used dealers do not assume this "special responsibility" to stand behind their goods absent evidence that they either reconditioned a product or made representations as to its fitness. But implicit in this argument is that a seller's "special responsibility" to the consumer depends on some affirmative act or acknowledgment on his part. In fact, sellers of new goods are not expected personally to inspect a product or modify it or make any representations as to its fitness as a precondition to strict liability. Instead, fitness is presumed at law from the simple fact that the product is offered for sale, and hence the special responsibility of the seller to the consuming public. Certainly, the Fourth Department, in *Stiles v. Batavia Atomic Horseshoes, Inc.*, 174 A.D.2d at 291, 579 N.Y.S.2d at 793, did not condition the strict liability of a used dealer on whether or not it had reconditioned the goods or made representations as to fitness. Neither does this court think that the New York Court of Appeals will adopt this part of defendant's argument.

■ Rather, this court thinks New York will conclude, as did the New Jersey court in *Turner v. Intern. Harvester Co., supra*, that regular dealers in used products, no less than regular dealers in new goods, do have a responsibility to provide the public with products that are serviceable. Whatever the wear and tear of time on used goods, dealers who, as a regular course of business, put

---

5. The Court notes that while the likelihood of a manufacturer being defunct at the time of a lawsuit is perhaps higher in cases of used rather than new products, this is more a function of time than of market. Some businesses collapse after only a few years, leaving sellers of new products without the ability to seek indemnification for actions in strict liability. On the other hand, some companies operate for decades, and are available for indemnification actions by used dealers sued by persons alleging a manufacturing defect.

such products in the market, are answerable at law if latent defects making the goods unreasonably dangerous cause injury. 133 N.J.Super. at 289, 336 A.2d at 69. Thus, a buyer of a used machine may not be entitled to expect it to last as long as a new one, but he is entitled to expect that there is no inherent safety defect. *Id.*

■ This responsibility to sell a used product free of latent defects is not shed by a simple "as is" disclaimer, because the "[b]argaining power and ability to protect one's interests" as between an ordinary consumer and a regular seller of used goods is not always equal. *Id.* at 291, 336 A.2d at 70. Certainly, New York does not permit the seller of a new product to avoid strict liability to an injured third party simply by selling a product "as is." *Velez v. Craine & Clark Lumber Corp.*, 33 N.Y.2d 117, 125, 350 N.Y.S.2d 617, 623, 305 N.E.2d 750, 754 (1973).

Used goods certainly present a risk of danger to the public from defects equal to if not greater than that of new products. Whether the risk of injury from such product defects should be borne by the seller or by the buyer, or, as in this case, by an innocent third-party injured by the product, is the real question here presented. Certainly, a purchaser or injured third party is no better situated to recover from a defunct manufacturer than the regular used products dealer. And yet, as among these three actors it is the used products dealer who in a very real sense "creates the risk" by reintroducing the defective product into the market. *See Nelson v. Nelson Hardware, Inc.*, 160 Wis.2d at 705, 467 N.W.2d at 524.

The public policy informing strict liability has generally demanded "that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in the defective products that reach the market.... It is to the public interest to discourage the marketing of products having defects that are a menace to the public." *Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 462, 150 P.2d 436, 440–41 (1944) (Traynor, J., concurring). While this policy is not so broad as to encompass occasional sellers of used products for reasons discussed in *Sukljian v. Charles Ross & Co., Inc., supra,* and comment f to section 402A of the Restatement, there can be no doubt that the most effective way to ensure against the hazards inherent when regular dealers create a market for used products is to impose strict liability on those dealers. As the Fourth Department recognized in *Stiles v. Batavia Atomic Horseshoes, Inc., supra,* it is such regular dealers who can best "spread the loss caused by defective products and [who] have the ability and knowledge to remove defects before placing the used product in the distribution chain." 174 A.D.2d at 291, 579 N.Y.S.2d at 793. This can be accomplished in a number of ways: insurance, higher costs to consumers that more accurately reflect the risk at issue, more care in inspecting used products, and more attention to the history of defects in products identical or similar to that being offered for sale.

While the Oregon court in *Tillman v. Vance Equipment Co., supra,* was concerned that imposition of strict liability on dealers in used products would "affect the prices of used goods" and "work a significant change in the very nature" of a secondary market that "appears to serve legitimate interests of buyers as well as sellers," *id.* 286 Or. at 755, 596 P.2d at 1303–04, this court does not think such factors would be given much weight in New York. Even assuming that buyers and sellers in the market for used goods have a mutual interest in keeping costs low by not having sellers incur the added expenses discussed in *Stiles,* that interest is not shared by a third party who may be injured by a defective product and who is left to bear the burden of the injury. Neither is this interest shared by the public at large, which may indirectly bear some of the injured person's burden. Strict liability always raises consumer costs. But such an increase may properly be offset by tort savings.

■ Section 402A of the Restatement endeavors to balance increased consumer costs against tort savings by imposing strict products liability on any regular seller of goods sold in a "defective condition unreasonably dangerous to the user or consumer." Whether or not the used press brake in this case was "unreasonably dangerous" given its

age and condition is a question of fact for the jury. *See generally Turner v. Intern. Harvester Co.*, 133 N.J.Super. at 291–92, 336 A.2d at 70. But the policy rationale for extending strict liability to the sale of unreasonably dangerous products, new or used, is explained in comment c to section 402A: "the burden of accidental injuries caused by products intended for consumption [should] be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained." Restatement (Second) of Torts § 402A cmt. c.

Although, as noted *supra*, New York has not expressly adopted section 402A of the Restatement, the courts of the state, including the Court of Appeals, cite approvingly to it and the policies outlined in its commentaries with sufficient frequency, *see, e.g., Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d at 95–97, 511 N.Y.S.2d at 823–25, 503 N.E.2d at 1359–62, to lead this court to conclude that New York will follow those other jurisdictions that find in the Restatement support for the application of strict liability to regular dealers in used goods. The Fourth Department decision in *Stiles* strongly supports this conclusion.

For the reasons stated herein, the court denies Rutherford's motion for summary judgment on plaintiff's strict liability claim.

### B. *Negligence*

Plaintiff sues Rutherford for negligence in selling a product without foot pedal guards, point of operation safety system, and hand tools for use at the point of operation. He further alleges that Rutherford was negligent in failing to warn of the dangers presented by operating the machine without these safeguards.

■ Although a retailer is not generally liable in negligence for the sale of a defective product, it is under a duty to inspect for and discover such defects "as a reasonable physical inspection would disclose." *Naples v. City of New York*, 34 A.D.2d 577, 578, 309 N.Y.S.2d 663, 666 (2d Dep't 1970). There is particular reason to require dealers in used products to heed this duty of inspection. As the Second Depart-

ment noted in *Outwater v. Miller*, 3 A.D.2d 670, 158 N.Y.S.2d 562 (2d Dep't 1957), when a vendor buys a product from a reputable source of supply, he has "reasonable grounds for believing the chattel to be free from defects." *Id.* at 670, 158 N.Y.S.2d at 563. But when a vendor buys "from an unknown manufacturer or from one of dubious reputation … he does not know the condition of the chattel and has no reasonable ground for believing the chattel to be free from dangerous defects." *Id.* Certainly, a used products dealer has no reasonable ground for believing that a piece of machinery it acquires and offers for resale is "free from dangerous defects." Thus, the law insists that it make some reasonable physical inspection before sale to avoid a finding of negligence for future injuries.

■ In this case, questions of fact requiring trial are present as to whether Rutherford conducted a reasonable physical inspection of the press brake and whether it thereafter acted reasonably in (1) itself failing to install safety devices or (2) failing to alert future users of possible risks.

As to the second possibility, Rutherford submits that it was under no duty to warn plaintiff of obvious risks. *See Rosebrock v. General Electric Co.*, 236 N.Y. 227, 240–41, 140 N.E. 571, 575 (1923). It argues that the risks inherent in placing one's hands in a press intentionally or accidentally activated are sufficiently obvious and well known to require no warning as to absent foot guards, point of operation guards, or hand tools. *Cf. Jiminez v. Dreis & Krump Mfg. Co., Inc.*, 736 F.2d 51, 55 (2d Cir.1984) (risk of injury to hands when press unintentionally activated not deemed obvious). If plaintiff's claim were so easily characterized, defendant's point might be well taken. Indeed, Rutherford is correct that the risks of operating the press brake without point of operation guards or hand tools would be so obvious to an operator as not to require a warning. But a liberal reading of the papers before this court suggests that plaintiff's complaint is not simply that he was not warned that an accidental activation of the foot pedal while his hands were near the unguarded point of operation, or any use of the machine without

hand tools, could result in injury. His claim is that he was never ·warned of the specific risk of accidentally activating the unguarded foot pedal if he leaned forward to position a metal sheet in the press brake. The court cannot say as a matter of law that the risks of activating the foot pedal by leaning forward were obvious to a user. *See id.* at 55–6 (extent of plaintiff's knowledge as to specific risk of injury makes summary judgment on duty to warn inappropriate); *accord Frederick v. Niagara Machine & Tool Works,* 107 A.D.2d 1063, 486 N.Y.S.2d 564 (4th Dep't 1985). To the contrary, it may well have seemed normal and reasonable to lean forward to position metal sheets on the press brake. "As a general rule, warnings are required to alert the user of a product to avoid certain uses that appear normal and reasonable but that may, in certain instances be dangerous." *Bickram v. Case I.H.,* 712 F.Supp. 18, 21 (E.D.N.Y.1989) (discussing New York law). Whether warnings were necessary in this case, and what warnings would have been adequate, are questions of fact for jury determination.

Summary judgment on plaintiff's negligence claim is denied.

### C. *Breach of Warranty*

Plaintiff sues Rutherford for breach of express and implied warranties of merchantability. Summary judgment is appropriately entered in favor of Rutherford on the express warranty claim, but not on that for implied warrant.

■ Plaintiff has adduced no evidence supporting a claim of express warranty. To the contrary, the undisputed evidence is that Rutherford sold the press brake at issue with a warranty disclaimer. Although the court has already discussed the ineffectiveness of such disclaimers where strict liability is invoked, *see Velez v. Craine & Clark Lumber Corp., supra,* the fact remains that no admissible evidence supports the maintenance of an express warranty claim in this case. *See* N.Y.U.C.C. § 2–313 (McKinney's 1993); *Friedman v. Medtronic, Inc.,* 42 A.D.2d 185, 345 N.Y.S.2d 637 (1973) (for express warranty to exist, there must be an affirmation of fact or promise by seller, the natural tendency of which is to induce the buyer to purchase); *Copeland v. Weyerhaeuser Co.,* 124 A.D.2d 998, 509 N.Y.S.2d 227 (4th Dep't 1986), *appeal dismissed,* 69 N.Y.2d 944, 516 N.Y.S.2d 656, 509 N.E.2d 351 (1987) (cause of action for warranty breach insufficient for failure to specify terms of alleged warranty).

■ Rutherford urges dismissal of the implied warranty claim on the ground that it duplicates the claim for strict liability. Some case law does support this argument. *See Ryion v. Len–Co Lumber Corp.* 152 A.D.2d 978, 979, 543 N.Y.S.2d 595 (4th Dep't) (claims for strict liability and breach of implied warranty "indistinguishable"), *leave to appeal denied,* 74 N.Y.2d 616, 549 N.Y.S.2d 961, 549 N.E.2d 152 (1989); *Dickey v. Lockport Prestress, Inc.,* 52 A.D.2d 1075, 1076, 384 N.Y.S.2d 609, 610 (4th Dep't 1976). Yet, as the Second Circuit recently noted in *Denny v. Ford Motor Co.,* 42 F.3d 106, 112 (2d Cir.1994), other cases seemingly approve the simultaneous submission of strict liability and implied warranty claims to the jury. *See Harvey v. Suds N' Fluff Laundromat, Inc.,* 194 A.D.2d 644, 645, 599 N.Y.S.2d 86, 88 (2nd Dep't 1993). Moreover, the state's pattern jury instructions continue to provide separate instructions for each of these claims. *Compare New York Pattern Jury Instructions— Civil* § 2. 141 (Supp.1993) (strict liability) *with id.* at § 2.141.3 (implied warranty).

In light of the ambiguity created by these authorities, the Second Circuit has certified to the New York Court of Appeals the question of whether strict liability and implied warranty are different claims. *Denny v. Ford Motor Co.,* 42 F.3d at 112. Until this question is answered, this court will not grant judgment in favor of Rutherford on the implied warranty claim, substantially for the reasons stated in discussing the issue of strict products liability.

### IV. *Daley–Hodkin's Motion Against Rutherford*

Should it be found liable to plaintiff, Rutherford sues Daley–Hodkin in a third-party action for indemnification and contribution, asserting strict liability and negligence

claims.[6] Daley–Hodkin is entitled to summary judgment on both claims.

■ As already discussed, New York's Court of Appeals has plainly held that a strict liability claim cannot be pursued against an occasional seller of used goods. *See Sukljian v. Charles Ross & Son Co., Inc.,* 69 N.Y.2d at 95–6, 511 N.Y.S.2d at 823–24, 503 N.E.2d at 1359–61. Indeed, the court in *Sukljian* cited approvingly to that portion of comment f of section 402A of the Restatement stating that strict liability does not "apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales and the like." *Id.* In this case, Daley–Hodkin sold the press brake at issue as agent of the Bank of New York, a creditor of ATF–Davidson, in connection with what was, in essence, a bankruptcy sale. On these facts, it is simply an occasional seller and cannot be sued under New York law for strict products liability.

■ Neither can it be sued for negligence. In *Sukljian,* the Court of Appeals noted that occasional sellers owed consumers a different duty from that of regular sellers. "At most, the duty of a casual or occasional seller would be to warn the person to whom the product is supplied of known defects that are not obvious or readily discernable." *Id.* at 97, 511 N.Y.S.2d at 825, 503 N.E.2d at 1362. Rutherford has adduced no evidence to support a claim that Daley–Hodkin failed to warn it of any defects in the press brake known to Daley–Hodkin but not obvious or readily discernable to Rutherford.

Summary judgment is granted in favor of Daley–Hodkin on all third-party claims.

### V. *Pyramid Equipment Leasing's Motion Against Rutherford*

Insofar as Rutherford sues Pyramid Equipment Leasing as a third-party defen-

dant, the court notes, as it did in stating the factual background to this case, that the invoice relating to Rutherford's sale of the press brake to Pyramid Equipment Leasing purportedly obliges the buyer to indemnify Rutherford for any judgment that may be entered against it in an action for strict products liability or breach of warranty. This document is not signed by Pyramid Equipment Leasing, which raises significant questions as to its enforceability in an action for contract. *See* N.Y.Gen.Oblig.Law § 5–701(a) (McKinney's 1989) (Statute of Frauds); *Kao v. Wang,* 98 A.D.2d 709, 710, 469 N.Y.S.2d 109, 111 (2nd Dep't 1983) (an unsigned letter from contractor to person employing him does not comport with Statute of Frauds and, thus, is not an enforceable indemnity agreement); *see also Kobre v. Instrument Systems Corp.,* 54 A.D.2d 625, 626, 387 N.Y.S.2d 617, 619 (1st Dep't 1976) (oral agreements to indemnify or to limit indemnification are not adequate under Statute of Frauds). It does not, however, appear that Rutherford is suing Pyramid Equipment Leasing to enforce a contract. It seeks indemnification on tort principles of strict liability and breach of warranty. The court concludes that summary judgment is properly entered in favor of Pyramid Equipment Leasing on these claims.

■ It appears universally accepted as New York law that strict products liability will not apply to finance lessors which merely offer the use of money to acquire goods but otherwise neither market a product nor place it in the stream of commerce. *Starobin v. Niagara Machine & Tool Works Corp.,* 172 A.D.2d 64, 65–6, 577 N.Y.S.2d 327, 328–29 (3d Dep't 1991); *Bickram v. Case I.H.,* 712 F.Supp. at 22 (applying New York law). In this case, there is no question that Pyramid Equipment Leasing's sole role was as a fi-

---

**6.** Rutherford concedes that, if the court were persuaded that New York would not hold it answerable to plaintiff on theories of strict liability or breach of warranty, the same logic would preclude it from suing Daley–Hodkin or Pyramid Equipment Leasing on such claims. Nevertheless, it submits that, if the court were to deny its summary judgment motion on these claims, it should be able to pursue tort actions against the third-parties. In fact, as the court endeavors to explain in this memorandum, Rutherford's tort duties as a regular seller of used equipment are different from those of an occasional seller, such as Daley–Hodkin, or a finance lessor, such as Pyramid Equipment Leasing.

nance lessor, enabling Capital Steel Fabrication to purchase the press brake at issue. As such, it cannot be sued in strict liability.

Neither can it be sued for any negligent failure to warn. As was noted in *Bickram v. Case I.H., supra,* a distributor's duty to warn under New York law applies only to "a dangerous condition which it could have discovered during the course of a normal inspection *while the product was in its possession*" (citations to New York cases omitted; emphasis added). It is undisputed that the press brake at issue was shipped directly to Capital Steel Fabrication and was never in the possession of Pyramid.

Summary judgment is granted in favor of Pyramid Equipment Leasing on all third-party claims.

*Conclusion*

Because this court thinks that New York would apply strict products liability to a regular dealer in used goods such as Rutherford, it denies Rutherford's motion for summary judgment on that part of plaintiff Gonzalez's complaint. It likewise denies Rutherford's motion for summary judgment on plaintiff's negligence and implied warranty claims. It grants Rutherford summary judgment on plaintiff's claim of express warranty. It grants Daley–Hodkin and Pyramid Equipment Leasing summary judgment on all third party tort claims brought against them by Rutherford.

*SO ORDERED.*