OPINION OF THE COURT
Kaye, J.
 A corporation that sold a machine previously used in its own production as surplus property was not liable to remote purchasers either in strict products liability or in negligence, for injuries allegedly resulting from a defect in the machine, and should have been awarded summary judgment dismissing the complaint.
On February 26, 1978, plaintiffs son, employed in his father’s business (Ardex Corporation), injured his hand while cleaning the rollers of a high-speed, three-roll grinding mill. The mill had been manufactured and sold by Charles Ross & Son Company, Inc. to the Missile and Space Department of General Electric Corporation in January 1962 for approximately $4,000. When General Electric purchased the mill, at its request the manufacturer added both a safety switch, which if tripped would bring the rollers to a stop, and a removable feed hopper, which permitted larger quantities of material to be fed into the mill and acted incidentally as a housing guard. Claimants’ theory is that both of these added features made the mill safer to use.*
*93 In June 1973, more than 11 years after its purchase of the mill, General Electric determined that the machine was no longer needed in its own production and included it as part of a sale of its surplus property, conducted with a sale of Government-owned surplus. There followed a series of transfers, ending some four years later with the mill back in production, in the hands of Ardex.
At the surplus sale in June 1973 — the second surplus sale of the year — several hundred lots were offered, some of them items of equipment, some of them hardware and metals sold by weight. General Electric held two or three sales of its surplus equipment a year; there is no evidence that General Electric derived any profit from such sales. The terms of the June 1973 sale were "As Is, Where Is”, and bidders were invited to inspect the property beforehand. The invitations to bid stated: "Seller makes no warranty, express or implied, as to quantity, quality, weight, size, character or description of any of the surplus property covered by this invitation.” The only indication that the June 1973 sale — or any surplus sale— received publicity is the following incomplete statement in a General Electric memorandum relating to "Government Owned Surplus”: "will be taken to advertise the sale through the various medias available, such as newspapers, trade magazines, trade papers, etc.”
The mill — apparently the only piece of equipment of its kind in the sale — was sold to Semco Equipment Company (not a party to this action) for $35. Whether or not the machine was sold as scrap metal is disputed by the parties, General Electric in its affidavits and testimony stating its understanding that the machine was to be scrapped and reduced to molten metal. There is no evidence as to whether the mill was in operable condition when it was sold by General Electric. At all events, several weeks after General Electric’s surplus sale, Semco resold the mill to Commercial, a dealer in new and used machinery, for $150. Commercial, in turn, sold the machine in February 1974 to K.M. Equipment Corporation, another dealer in new and used machinery, which purchased it together with two other mills for $850 under the name East Bay Industries, as a joint venture with Alex Zeeve and Company. Zeeve and East Bay owned the machine for approximately two years, during which time they reconditioned and *94 rebuilt it to its original specifications by regrinding the rollers, recutting the gears, refitting the end plates, cleaning and painting. In April 1976, the machine was sold to Ardex, where it was installed by Charles W. Ashline Plumbing & Heating Inc. in 1977. At the time the mill was received by K.M., it had neither the safety switch nor the feed hopper.
Following his son’s accident, plaintiff asserted claims in strict products liability, negligence and breach of warranty against Ross, the manufacturer, and K.M., the seller. K.M. then commenced a third-party action against Zeeve, Commercial, Ardex and General Electric; Ardex and Zeeve asserted cross claims for contribution and indemnity against General Electric; Zeeve impleaded East Bay; East Bay and K.M. impleaded Ashline. Upon the completion of discovery, General Electric sought summary judgment claiming that it did not sell the machine in the ordinary course of business and therefore owed no duty to plaintiff. Both lower courts granted the motion on this basis as to the strict liability claims, but denied summary judgment as to the negligence claims, finding issues of fact as to foreseeability that the machine would again be used in production. Special Term granted General Electric summary judgment on the breach of warranty claim because there was no privity of contract between the parties and because the sale was on an "as is” basis (Martin v Dierck Equip. Co., 43 NY2d 583), and that ruling was not appealed. The Appellate Division granted General Electric, K.M. and East Bay leave to appeal to this court.
The issues before us are whether the Appellate Division correctly granted summary judgment dismissing the strict liability claims against General Electric, and whether it correctly denied summary judgment as to the negligence claims. We conclude that the claims against General Electric should have been dismissed in their entirety.
Turning first to the strict liability claims, a product may be defective by reason of a manufacturing flaw, improper design or failure to warn (see, Voss v Black & Decker Mfg. Co., 59 NY2d 102, 106-107; Robinson v Reed-Prentice, 49 NY2d 471, 478-479; see also, Lopez v Precision Papers, 67 NY2d 871).
Manufacturers of defective products may be held strictly liable for injury caused by their products, regardless of privity, foreseeability or due care (Voss v Black & Decker Mfg. Co., 59 NY2d 102, 106, supra; Codling v Paglia, 32 NY2d 330, 342; see also, PJI 2:141). Imposition of this onerous liability rests *95 largely on considerations of public policy (Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 401; see also, Restatement [Second] of Torts § 402 A comment c; Prosser and Keeton, Torts § 98 [5th ed]). Given the increased complexity of modern products and modern production methods, most often only the manufacturer "can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose”; by the same token, the manufacturer most often "alone has the practical opportunity, as well as a considerable incentive, to turn out useful, attractive, but safe products.” (Codling v Paglia, 32 NY2d 330, 340, 341, supra; see also, Caprara v Chrysler Corp., 52 NY2d 114, 123; Micallef v Miehle Co., 39 NY2d 376, 383.)
Policy considerations have also been advanced for the imposition of strict liability on certain sellers, such as retailers and distributors of allegedly defective products. Where products are sold in the normal course of business, sellers, by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation; additionally, by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods (see, Mead v Warner Pruyn Div., 57 AD2d 340; Kirby v Rouselle Corp., 108 Misc 2d 291; Vandermark v Ford Motor Co., 61 Cal 2d 256, 391 P2d 168; see also, Restatement [Second] of Torts § 402 A comment c).
But not every seller is subject to strict liability. The policy considerations that have been advanced to justify the imposition of strict liability on manufacturers and sellers in the normal course of business obviously lack applicability in the case of a party who is not engaged in the sale of the product in issue as a regular part of its business. (See, Restatement [Second] of Torts § 402 A, comment f, concluding: "This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.”) The casual or occasional seller of a product does not undertake the special responsibility for public safety assumed by those in the business of regularly supplying those products, nor is there the corollary element of forced reliance on that undertaking by purchasers of such goods. As a practical matter, the occa *96 sional seller has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the public consumer does not have the same expectation when it buys from such a seller. We recognized, for example, in Gobhai v KLM Royal Dutch Airlines (57 NY2d 839, affg 85 AD2d 566), in affirming the grant of summary judgment to an airline defendant sued in strict liability for allegedly defective slippers given a passenger, that where distribution of an allegedly defective product is incidental to defendant’s regular business the principles of strict products liability have no relevance.
Both Special Term and the Appellate Division correctly concluded that strict liability was inapposite because there was no showing that General Electric was regularly engaged in the business of selling the equipment in issue. As in Gobhai (supra), the sale of the mill — indeed the surplus sale itself— was wholly incidental to the regular business of General Electric and, as such, not governed by the policy considerations underlying the imposition of strict liability. In reaching the conclusion as a matter of law that strict liability does not apply here, we cannot ignore the undisputed circumstances of the sale. The machine was being sold after more than 11 years in production. The sale was on an "As Is — Where Is” basis, purchasers were invited to inspect the property before buying and denied any warranties, and the price was $35, less than 1% of General ELectric’s own purchase price for the equipment more than a decade earlier.
Claimants assert that there is a question of fact whether General Electric was in reality in the regular business of a second-hand equipment dealer, relying on Galindo v Precision Am. Corp. (754 F2d 1212). In that case, however, there was evidence that the seller of the subject sawmill trimmer operated more than 240 sawmills and plants and regularly sold its used sawmill equipment to dealers (see also, Jordan v Sunnyslope Appliance Propane & Plumbing Supplies Co., 135 Ariz 309, 660 P2d 1236); there was no evidence of any special conditions of sale such as were present here.
Even if we were to recognize that liability might be imposed in a case such as hypothesized in Galindo (supra) — i.e., regular, periodic dispositions of sawmill equipment, a division devoted to selling that equipment, widespread advertising, and substantial revenues from that activity (id., at p 1219) — this *97 record contains no such facts. There is no basis in the undisputed facts before us to support an inference that General Electric, in incidentally disposing of the mill at a surplus equipment sale in the manner it did, undertook any special responsibility to the public for product safety, or was perceived by the public as having done so, or was better able to spread any loss caused by such defective products, making it more equitable to impose such loss on the seller (see, Galindo v Precision Am. Corp., 754 F2d 1212, 1218, supra; see generally, When is Person "Engaged in the Business” for Purposes of Doctrine of Strict Liability, Ann., 99 ALR3d 671; Prosser and Keeton, Torts § 100 [5th ed]). While we recognize that more than the single or isolated sale of a jam jar, a pound of sugar or an automobile described in the Restatement (Restatement [Second] of Torts § 402 A comment f) is at issue here, still the principle is the same whether an individual, or an airline, or a huge corporation disposing of its surplus equipment in an occasional sale is involved: there is no basis in public policy for the imposition of strict liability, and summary judgment was correctly granted.
The same result should follow as to the negligence issue.
Claimants begin their analysis with a contention that, though it sold the mill in a surplus sale, General Electric should have foreseen that the machine might be returned to production. We have, however, several times made clear that a determination of negligence — i.e., breach of duty — must begin with consideration of the duty owed, which is a matter of policy, rather than with the issue of foreseeability (see, De Angelis v Lutheran Med. Center, 58 NY2d 1053; Pulka v Edelman, 40 NY2d 781). At most, the duty of a casual or occasional seller would be to warn the person to whom the product is supplied of known defects that are not obvious or readily discernible (see, Copp v Corning Glass Works, 114 AD2d 144; see also, Restatement [Second] of Torts § 388). This orbit of duty is consistent with the recognition that, unlike the manufacturer (see, Schumacher v Shear Co., 59 NY2d 239 [successor to manufacturer]; Micallef v Miehle Co., 39 NY2d 376, supra [manufacturer]) or the seller of a product in the normal course of business, the occasional seller is not part of the regular commercial network for that product. General Electric breached no duty to claimants by its alleged failure to warn of the absence of the safety switch and feed hopper.
Accordingly, the order should be modified, with costs to *98 third-party defendant General Electric, by granting summary judgment to General Electric dismissing the negligence claims asserted against it and, as so modified, affirmed. The certified question should be answered in the affirmative.

The safety switch did not become a mandatory part of the machine until 1975, following promulgation of standards by the American National Stan *93 dards Institute, Inc. There is no evidence that the removable feed hopper ever became mandatory.