07-0507-cv
Jaramillo v. Weyerhaeuser Co.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2007

(Argued: March 5, 2008       Certified Question: August 1, 2008)

Docket No. 07-0507-cv

_____

MARIO MIGUEL JARAMILLO,
*Plaintiff-Appellant*,

-v.-

WEYERHAEUSER COMPANY and TECHNOLOGY LICENSING ASSOCIATES, INC.,
*Defendants-Cross-Claimants-Cross-Defendants-Appellees*,

CORRUGATED GEAR AND SERVICES, INC.,
*Defendant-Cross-Claimant*,

KRAFT FOODS GLOBAL, INC. and PRIME TECHNOLOGY, INC.,
*Defendants-Cross-Defendants-Appellees*.

_____

Before:  WESLEY, LIVINGSTON, *Circuit Judges*,
     and COGAN, *District Judge*.[*]

A worker injured by a used industrial machine owned by his employer sought to hold the

machine's former owner strictly liable in tort under New York law. The United States District Court

_____

[*]The Honorable Brian M. Cogan, United States District Judge for the Eastern District of
New York, sitting by designation.

for the Southern District of New York (Buchwald, *J.*) granted summary judgment dismissing the complaint and denied plaintiff's cross-motion seeking a declaration that defendant could be held strictly liable. Plaintiff appealed.

Question certified.

JAMES ALEXANDER BURKE, Larkin, Axelrod, Ingrassia, & Tetenbaum, LLP, Newburgh, New York, *for Plaintiff-Appellant*.

KEVIN BURNS, Goldberg Segalla, LLP, White Plains, New York, *for Defendant-Cross-Claimant-Cross-Defendant-Appellee Weyerhaeuser Company*.

LIVINGSTON, *Circuit Judge*:

Plaintiff-appellant Mario Miguel Jaramillo appeals from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*), granting defendant-appellee Weyerhaeuser Company's ("Weyerhaeuser") motion for summary judgment, denying Jaramillo's cross-motion, and dismissing the complaint. *Jaramillo v. Weyerhaeuser Co.*, No. 03 Civ. 1592 (NRB), 2007 WL 194011 (S.D.N.Y. Jan. 24, 2007). Jaramillo seeks in this diversity action to hold Weyerhaeuser strictly liable under New York law for a personal injury he sustained in 2002 while operating an industrial machine called a Flexo Folder Gluer ("FFG") that Weyerhaeuser purchased second-hand in 1971 and used for fifteen years before selling to Jaramillo's employer, Glenwood Universal Packaging ("Glenwood") in 1986. Weyerhaeuser argues that it cannot be held strictly liable because it was a "casual" or "occasional" seller of FFGs, not an "ordinary" or "regular" seller. We conclude that this case requires us to resolve a significant question concerning when a seller of used machinery may be deemed a regular seller for purposes of New York's strict products liability

law. For the reasons that follow, we believe this question should be answered by the New York courts and, accordingly, we certify it to the New York Court of Appeals.

**BACKGROUND**

Unless otherwise noted, the following facts were undisputed for purposes of the summary judgment motions.

*A.     Weyerhaeuser's Business Operations*

Weyerhaeuser is an international paper company with its principal place of business in the state of Washington. It is involved in numerous ventures, including growing and managing forests, producing paper and wood, and providing certain financial services. Among its many business activities, Weyerhaeuser operates plants that produce cardboard boxes from corrugated cardboard sheets. FFGs are used in the manufacture of such boxes. In the 1980s, most of Weyerhaeuser's 65 box plants in the United States and Europe used two or three FFGs. As of 2005, the company employed about 197 such machines at its 79 U.S. plants.

The FFG at issue in this case was sold used in 1986 by Weyerhaeuser's Investment Recovery Business ("IRB"), the division through which the company generally disposes of its obsolete or otherwise unneeded equipment. According to the IRB's 1983 Policy and Procedure Manual, the purpose of the IRB "is to manage the orderly disposition of idle facilities, equipment, material and supplies, which are no longer economically useful to Weyerhaeuser Company in their present form or location." The manual provides that the IRB's objectives include, among other things, maintaining

3

cash flows by providing for the timely disposal of surplus assets, recovering the maximum value from surplus assets, and increasing the margins on third-party sales by offering refurbished equipment and engaging in full-time sales efforts. The surplus assets sold by the IRB have included Flexo machines such as the FFG, as well as other equipment from Weyerhaeuser's box plants, including conveyors, drives, sheeters, and trucks and automobiles. The 1983 IRB manual indicates that the IRB markets Weyerhaeuser's used equipment by distributing quarterly catalogs, advertising in trade journals, telemarketing, and conducting market research on potential buyers and dealers of used equipment.

Although the parties disagree on the precise amount, it is common ground that the IRB grossed somewhere between $7.5 and $8.5 million in 1986, the year Weyerhaeuser sold the FFG that eventually injured Jaramillo. This accounted for approximately 0.15 percent of Weyerhaeuser's net sales of about $5.65 billion that year. The IRB had around 15 employees at that time and maintained three facilities where surplus equipment was awaiting sale.

B.      Flexo Folder Gluers

        1.      Weyerhaeuser and FFGs Generally

There is no evidence in the record concerning Weyerhaeuser's sales of used FFGs before 1986. There is some dispute concerning the frequency with which Weyerhaeuser sold used FFGs thereafter. The parties submitted documents from Weyerhaeuser's "WEYPAC" accounting system, which inventoried the items sold through the IRB from 1986 to 2006. According to Jaramillo, the WEYPAC documents show that during that time, Weyerhaeuser sold around 60 FFGs in the United

4

States—an average of about 3 per year—and that these sales generated revenues of about $6.4 million—an average of about $107,000 per machine. Jaramillo maintains that these numbers do not account for all of the FFGs sold by Weyerhaeuser during this time.

Weyerhaeuser asserts that Jaramillo misinterprets the WEYPAC documents and includes in his count machines that are not FFGs. Weyerhaeuser contends that the proper number is about 19 machines sold in the United States in the last 25 years, an average of less than one machine per year.

In addition, there is evidence that Weyerhaeuser owns patents related to technology used in FFGs, and that the company maintains relationships with FFG manufacturers. It has occasionally made recommendations to manufacturers about how to improve FFG design, including with regard to safety features. When it has detected safety issues with an FFG, the company has also sometimes suggested that the manufacturer install a new safety mechanism in the machine in question. Specifically relevant to this case, older FFGs have "open architecture," which means that they have open spaces between operating sections that a person can enter while the machine is in operation. "Closed architecture" machines, in contrast, do not permit such entry. To make open architecture machines safer, a safety mat or an interlocking device may be installed to stop the machine automatically if a safety gate leading to one of the open spaces is accessed. Weyerhaeuser has added interlocking devices to some of its open architecture FFGs or had the manufacturer do so.

## 2. *The FFG in this Case*

The FFG that injured Jaramillo was an open architecture machine manufactured around 1964 by S&S Manufacturing ("S&S"), a Brooklyn-based company that went bankrupt around 1986. The

FFG was sold new to the General Foods Company, which used the machine in a cereal plant in Battle Creek, Michigan from about 1964 until 1971. Weyerhaeuser purchased the machine from General Foods in 1971 for about $36,500, and installed it in its Lynchburg, Virginia box plant. Weyerhaeuser added a vacuum transfer system and installed a solid state drive and motor. In 1984, Weyerhaeuser also conducted a "rebuild" of the machine, replacing all worn parts. It made no changes to the safety mechanisms installed by S&S in the original manufacture. Weyerhaeuser's total investment in the machine was around $282,000.

The machine was still functional in 1986—fifteen years after its purchase by Weyerhaeuser and more than twenty years following its manufacture—and Weyerhaeuser had it running two shifts per day. Weyerhaeuser nevertheless decided to sell the machine through the IRB to Glenwood, a Yonkers-based company, for about $70,000. The machine was disassembled in Virginia by a Glenwood employee, transported to Yonkers, and reassembled at the Glenwood plant.

The parties were unable to locate the invoice from the 1986 sale. The heading of a sample IRB sales invoice from 1986, however, states that equipment is "SOLD AS IS, WHERE IS, WITH ALL FAULTS." According to the deposition testimony of former Weyerhaeuser employee Walter Paulson, this meant that potential buyers were invited to inspect IRB products to decide if they wanted to buy them in the condition in which they were displayed. Paulson testified also that "most of the time" IRB sales were "done as-is, where-is," and that the company "never warranted anything, guaranteed anything." Accordingly, while there is little direct evidence of the conditions of the sale, the existing evidence indicates that the machine was sold "as is, where is" and without any express

6

warranties.[1]

*C.      The Accident and Subsequent Litigation*

Glenwood used the FFG it had purchased from Weyerhaeuser for sixteen years without incident. By March 9, 2002, the date of his injury, Jaramillo had been employed by Glenwood for about five years and had operated the machine on numerous occasions. Jaramillo set up the machine on the morning of March 9 and ran an initial test print of a cardboard box. During the test, he "entered" the machine—that is, stepped into one of the open spaces between the operating sections—while it was running. His right hand was inadvertently caught between two rollers and seriously injured.

Jaramillo filed a complaint in New York Supreme Court naming Weyerhaeuser, Corrugated Gear and Services, Inc., the successor-in-interest to S&S, Technology Licensing Associates, Inc. and Prime Technology, Inc., purchasers of some of S&S's bankrupt estate, and Kraft Foods Global, Inc., the successor-in-interest to General Foods, the original purchaser of the machine. The claim against Weyerhaeuser sounded principally in strict products liability. Jaramillo's theory in essence was that by 1986, when Weyerhaeuser sold the used FFG to Glenwood, open architecture machines were

---

[1] Jaramillo claims that this evidence is insufficient to show that Weyerhaeuser sold the machine that injured him "as is, where is," as Paulson's testimony about what the company did most of the time does not establish what it did in this case. The plaintiff-appellant, however, who bore the burden of establishing that Weyerhaeuser was a regular seller of used FFGs, *see Suklijian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 96, 511 N.Y.S.2d 821, 824 (1986) (affirming grant of summary judgment dismissing strict products liability claim where there was "no showing" that the defendant was a regular seller), adduced no evidence tending to show that the machine was sold on some basis other than "as is, where is." We agree with the district court that in the absence of such evidence, "there is no genuine dispute of fact as to whether the machine was sold in 'as-is, where is' condition." *Jaramillo*, 2007 WL 194011 at *1 n.7.

7

defective in character if not equipped with devices to shut off operation in the event open spaces were accessed. The gist of Jaramillo's claim was that Weyerhaeuser failed to add safety features to the machine—either a safety mat or an interlocking safety gate—that would have prevented Jaramillo's injury.

The case was removed to the Southern District of New York on March 7, 2003. Weyerhaeuser moved for summary judgment, arguing principally that the company was a "casual seller" of FFGs and therefore could not be held strictly liable for any defects under New York law.[2] Jaramillo cross-moved, seeking a declaration that Weyerhaeuser was subject to strict products liability as an "ordinary seller" of FFGs. Jaramillo discontinued his claims as to the other defendants, leaving only his allegations against Weyerhaeuser. The district court granted Weyerhaeuser's summary judgment motion, denied Jaramillo's cross-motion, and dismissed the complaint.[3] This appeal followed.

---

[2]Weyerhaeuser argued also that the machine was not defective, and that even if it were, the defect nevertheless was not the proximate cause of Jaramillo's injury. The company withdrew these aspects of its summary judgment motion, although it did not concede the issues, and proceeded to seek summary judgment only on the casual seller question.

[3]In addition to the strict products liability claim, Jaramillo asserted claims against Weyerhaeuser sounding in negligence and breach of warranty. The district court concluded that there was insufficient evidence that the company acted negligently or made any warranty to Glenwood, and it therefore dismissed these claims. *See Jaramillo*, 2007 WL 194011 at *6. Jaramillo's brief to this Court focuses solely on the casual/regular seller issue. We do not consider the dismissal of his remaining claims. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

**DISCUSSION**

Summary judgment is warranted only upon a showing by the movant "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See, e.g.*, *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001). In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Celotex*, 477 U.S. at 322-23; *see Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

The Court reviews *de novo* both the grant of Weyerhaeuser's motion for summary judgment and the denial of Jaramillo's cross-motion, in each case construing the evidence in the light most favorable to the nonmoving party. *Scholastic*, 259 F.3d at 81.

*A.     Ordinary and Occasional Sellers*

Under New York law, the seller of a product ordinarily is strictly liable for injuries caused by any manufacturing, design, or warning defect. *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89, 94, 511 N.Y.S.2d 821, 823 (1986). The strict liability doctrine is not so broad as to cover every seller of every good, however. New York courts distinguish between "ordinary" or "regular" sellers of a product—those who sell the product on a regular basis, through the ordinary course of business—and

9

"casual" or "occasional" sellers—those who sell the product in sporadic transactions that are incidental to their businesses. The liability of a casual seller extends only insofar as it fails "to warn the person to whom the product is supplied of known defects that are not obvious or readily discernible." *Id.* at 94-97, 511 N.Y.S.2d at 823-25.[3] Moreover, the New York Court of Appeals has expressly noted that the question whether the doctrine of strict products liability applies to regular sellers of *used* goods is an open question in New York. *See Stiles v. Batavia Atomic Horseshoes, Inc.*, 81 N.Y.2d 950, 951, 597 N.Y.S.2d 666, 667 (1993).

There are two principal reasons for imposing strict products liability on ordinary sellers. The first is that those who sell products in the normal course of business, "by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation." *Sukljian*, 69 N.Y.2d at 95, 511 N.Y.S.2d at 823. The second is that those who market products as a regular part of their businesses "may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods." *Id.*

In contrast, the occasional seller exception is based upon the opposite presumptions. "[T]he occasional seller has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the

---

[3]This rule is reflected in the Restatement (Second) of Torts § 402A, which the New York Court of Appeals has yet to adopt explicitly, *Stiles v. Batavia Atomic Horseshoes, Inc.*, 174 A.D.2d 287, 291 & n.1, 579 N.Y.S.2d 790, 793 & n.1 (4th Dep't 1992) (citing *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 387-88, 384 N.Y.S.2d 115, 122 (1976)), *rev'd on other grounds* 81 N.Y.2d 950, 597 N.Y.S.2d 666 (1993), but which it has cited with approval in discussing the scope of strict products liability, *see, e.g.*, *Sukljian*, 69 N.Y.2d at 95, 511 N.Y.S.2d at 823.

10

public consumer does not have the same expectation when it buys from such a seller." *Id.* at 95-96, 511 N.Y.S.2d at 824.

While the reasons behind the ordinary seller rule and occasional seller exception are clear, where to draw the line between ordinary and occasional sellers is not.

### *1.* Galindo

The principal case on which Jaramillo relies to argue that Weyerhaeuser is an ordinary seller of used FFGs is *Galindo v. Precision American Corp.*, 754 F.2d 1212 (5th Cir. 1985). Applying Texas law, the Fifth Circuit rejected the view of the district court in that case that "'getting rid of the depreciated equipment used for production of the goods and services that constitute the business of the seller' can never constitute a business in which the seller is engaged." *Id.* at 1219 (quoting district court). In *dictum*, the court opined that a business that sells its obsolete assets "[c]learly" would not be exempt from strict products liability if: (1) the company "ha[d] a policy of purchasing new equipment . . . [for example,] every five years"; (2) the company "ha[d] a division or department devoted to selling the used equipment"; (3) "the department advertise[d] the availability of equipment on a widespread basis"; and (4) the company "realize[d] substantial revenues from this activity." *Id.* The court concluded that "there may well exist circumstances in which, because of the number of sales or the extent of sales activities, a seller of depreciated equipment would fit squarely within the rationale for imposition of strict liability." *Id.* at 1220-21.

*2.* Sukljian

The leading New York case on the ordinary/occasional seller distinction, and the one on which Weyerhaeuser relies heavily, is *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89, 511 N.Y.S.2d 821. In that case, General Electric Corporation ("GE") purchased a grinding mill for about $4,000, had the manufacturer install a safety switch and removable feed hopper, used the machine for about eleven years, and then sold it in a surplus sale. The mill was the only piece of equipment of its kind sold at this sale, the terms of which were "as is, where is." Bidders were invited to inspect the machine, and were told that there were no warranties on the equipment. There was some evidence that the sale was advertised in newspapers and magazines. The mill was sold for $35, and thereafter passed through various hands—including a used equipment dealer that rebuilt the machine to its original specifications, removing the safety switch and feed hopper—before eventually being sold to the plaintiff's employer. *Id.* at 92-94, 511 N.Y.S.2d at 822-23.

The plaintiff injured his hand while using the mill and sued the manufacturer as well as the intermediate seller who had rebuilt it. GE was impleaded on a strict liability theory and moved for summary judgment, *inter alia*, dismissing the strict liability claim on the ground that the company was an occasional seller of grinding mills. The Supreme Court granted this branch of the motion and the Appellate Division affirmed. *Id.*

The New York Court of Appeals affirmed as well, holding that "there was no showing that General Electric was regularly engaged in the business of selling the equipment in issue." *Id.* at 96, 511 N.Y.S.2d at 824. The Court relied on the facts that: (1) the machine was sold by GE after more than 11 years in use; (2) the surplus sale was on an "as is, where is" basis; (3) purchasers were

12

invited to inspect the property before buying and were denied any warranties; and (4) the price was $35, less than one percent of GE's own purchase price for the equipment. *Id.* The Court referenced the *dictum* in *Galindo*, but ultimately concluded that, "[e]ven if we were to recognize that liability might be imposed in a case such as hypothesized in *Galindo*—i.e., regular, periodic dispositions of sawmill equipment, a division devoted to selling that equipment, widespread advertising, and substantial revenues from that activity—this record contains no such facts." *Id.* at 96-97; 511 N.Y.S.2d at 824 (citations omitted).

*B.     This Case*

Jaramillo contends that this case is just like the one envisioned by *Galindo*, primarily because Weyerhaeuser had a division for selling used goods that grossed between $7.5 and $8.5 million a year, advertised its used equipment extensively, and sold up to three used FFGs per year in the twenty years from 1986 to 2006. In addition, Jaramillo points to the facts that Weyerhaeuser maintained relationships with FFG manufacturers and made safety recommendations to them, and that the company made alterations to the machine that allowed it to sell the machine to Glenwood for twice the amount Weyerhaeuser had paid for the FFG when Weyerhaeuser acquired it from General Foods. Jaramillo claims that imposing strict liability in this case therefore would advance the policy goals of the regular seller rule.

Weyerhaeuser responds that the IRB's gross revenue of around $7 to $8 million a year is too small a portion of the company's total revenue to be deemed "substantial" within the meaning of *Galindo*, and that even three sales of used FFGs per year is too infrequent to trigger strict liability.

13

The company likens this case to *Sukljian*, pointing to the facts that the IRB sold equipment on an "as is, where is" basis and without express warranties, that the machine was sold to Glenwood fifteen years after Weyerhaeuser's purchase and twenty-two years after it was manufactured, and that the company sold the machine for $70,000, after having invested over $280,000.

In short, the resolution of the summary judgment motions turns principally on the questions whether the New York courts would recognize the *Galindo* hypothetical as a case where strict liability should be imposed, and whether the facts of this case are sufficiently similar to that hypothetical such that Weyerhaeuser should be deemed an ordinary seller of used FFGs. We conclude that these questions are best answered by the New York Court of Appeals.

Pursuant to Second Circuit Local Rule § 0.27 and New York law, "we may certify a question to the Court of Appeals when a question of New York law is 'determinative' of a claim before us and 'no controlling precedent of the Court of Appeals' resolves the question." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007) (quoting N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27). In deciding whether to certify, we consider three main issues: (1) the absence of authoritative state court decisions relating to the issue; (2) the importance of the issue to the state and whether the question implicates issues of state public policy; and (3) the capacity of certification to resolve the litigation. *Id.*

The issue raised by this case is appropriate for certification. First, since *Sukljian*, the New York Court of Appeals has not had an opportunity to address a case like the hypothetical posed by *Galindo*. Indeed, it appears to remain an open question in New York whether strict products liability can attach to a regular seller of used goods at all, let alone companies like the one envisioned by the

14

*Galindo* court. *See Stiles*, 81 N.Y.2d at 951, 597 N.Y.S.2d at 667 (leaving open question whether used goods dealers may be held strictly liable); *but see Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 836-41 (E.D.N.Y. 1995) (Raggi, *J.*) (discussing cases extending strict liability to used goods dealers, including two Appellate Division cases).

Second, the regular seller doctrine is intended to advance certain public policy goals, such as spreading the costs of accidents, encouraging improvements in products safety and quality, and preserving consumer expectations. However, as the district court suggested in this case, extending strict products liability to companies like Weyerhaeuser raises concerns about the potentially deleterious effects on the market for used equipment, which not only helps companies dispose of obsolete assets in an efficient way, but also makes low-cost equipment available for smaller companies that otherwise might not be able to afford it. *See Jaramillo*, 2007 WL 194011 at *5. Accordingly, whether and to what extent courts should impose strict liability on sellers of used equipment like Weyerhaeuser depends on the weighing of various policy considerations, which is best accomplished by the New York Court of Appeals. *See Sealed v. Sealed*, 332 F.3d 51, 59 (2d Cir. 2003) (certification favored where question of state law "implicates the weighing of policy concerns").

Finally, most of the material facts in this case are not in dispute. The principal remaining issue that could conceivably matter is precisely how many used FFGs Weyerhaeuser sold each year after 1986. Weyerhaeuser maintains that even crediting Jaramillo's assertion that the company sold an average of three used FFGs per year from 1986 to 2006, this is inadequate to bring it within the scope of the regular seller doctrine, assuming the doctrine applies to sellers of used industrial

15

machines at all. Jaramillo disputes this, arguing that the sale of large industrial machines at an average price in excess of $100,000 over a period of many years is adequate to invoke the regular seller doctrine, even assuming a small number of average yearly sales. The evidence adduced by Jaramillo, however, relates only to sales occurring in 1986—the year that the sale to Glenwood took place—and afterwards, and does not pertain to the years leading up to the sale of the FFG that injured him. At any rate, given that the potentially material issues here are largely undisputed, a response from the New York Court of Appeals to the question whether a seller of used industrial equipment such as Weyerhaeuser may be deemed a regular seller and therefore held strictly liable, and in what circumstances, will, we believe, be sufficient to dispose of the parties' summary judgment motions.

We therefore certify the question below to the New York Court of Appeals, which of course may reformulate or expand upon the question as it sees fit. *See Pachter v. Bernard Hodes Group, Inc.*, 505 F.3d 129, 135 (2d Cir. 2007). We express our appreciation for the Court of Appeals's consideration of this matter.

### CONCLUSION

It hereby is ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that court declines certification. Finally, we order the parties to bear

equally any fees and cost that may be requested from the New York Court of Appeals.

**CERTIFICATE**

The following question hereby is certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and 22 N.Y.C.R.R. § 500.27, as ordered by the Court of Appeals for the Second Circuit:

> Construing the evidence in the light most favorable to Jaramillo, is Weyerhaeuser Company a "regular seller" of used Flexo Folder Gluers such that it can be held strictly liable under New York law?