[906 NE2d 387, 878 NYS2d 659]

Mario Miguel Jaramillo, Appellant, v Weyerhaeuser Company, Respondent, et al., Defendants.

Argued February 11, 2009; decided March 31, 2009

**POINTS OF COUNSEL**

*Larkin, Axelrod, Ingrassia & Tetenbaum, LLP,* Newburgh (*James Alexander Burke* of counsel), for appellant. I. Construing the evidence in the light most favorable to Mario Miguel Jaramillo, Weyerhaeuser Company is a "regular seller" of used Flexo Folder Gluers. (*Sprung v MTR Ravensburg,* 99 NY2d 468; *Sukljian v Ross & Son Co.,* 69 NY2d 89; *Brumbaugh v CEJJ, Inc.,* 152 AD2d 69; *Velez v Craine & Clark Lbr. Corp.,* 33 NY2d 117; *Bielicki v T.J. Bentey, Inc.,* 248 AD2d 657; *Winckel v Atlantic Rentals & Sales,* 159 AD2d 124; *Mead v Warner Pruyn Div., Finch Pruyn Sales,* 57 AD2d 340; *Chandler v Northwest Eng'g Co.,* 111 Misc 2d 433; *Kirby v Rouselle Corp.,* 108 Misc 2d 291; *Weber v Johns-Manville Corp.,* 630 F Supp 285.) II. Strict products liability should be imposed under New York law on "regular sellers" of used goods in the circumstances presented by this case. (*Stiles v Batavia Atomic Horseshoes,* 81 NY2d 950; *Gonzalez v Rutherford Corp.,* 881 F Supp 829; *Nutting v Ford Motor Co.,* 180 AD2d 122; *Sprung v MTR Ravensburg,* 99 NY2d 468; *Harber v Altec Indus., Inc.,* 812 F Supp 954; *Voss v Black & Decker Mfg. Co.,* 59 NY2d 102; *Velez v Craine & Clark Lbr. Corp.,* 33 NY2d 117; *Denny v Ford Motor Co.,* 87 NY2d 248; *Castro v QVC Network, Inc.,* 139 F3d 114; *Micallef v Miehle Co., Div. of Miehle-Goss Dexter,* 39 NY2d 376.)

*Goldberg Segalla, LLP,* White Plains (*Kevin Burns, Anita Hotchkiss* and *Matthew S. Lerner* of counsel), for respondent. I. Weyerhaeuser Company is a casual seller of Flexo Folder Gluers and thus not subject to strict liability for the sale of the machine on which plaintiff injured himself. (*Sukljian v Ross & Son Co.,* 69 NY2d 89; *McCarthy v Checchin,* 24 AD3d 1080; *Burns v Haines Equip.,* 284 AD2d 922.) II. In the alternative, if this Court reaches the second portion of the certified question, it should reject the *Galindo* factors in favor of the majority rule

and refuse to extend strict liability to regular sellers of used goods. (*Nutting v Ford Motor Co.,* 180 AD2d 122; *Bruce v Martin-Marietta Corp.,* 544 F2d 442; *Consorti v Owens-Corning Fiberglas Corp.,* 86 NY2d 449; *Sukljian v Ross & Son Co.,* 69 NY2d 89; *Stiles v Batavia Atomic Horseshoes,* 81 NY2d 950; *Gebo v Black Clawson Co.,* 92 NY2d 387; *Schumacher v Richards Shear Co.,* 59 NY2d 239; *Semenetz v Sherling & Walden, Inc.,* 7 NY3d 194.)

*Theodore Hadzi-Antich,* Sacramento, California, and *Deborah J. La Fetra* for Pacific Legal Foundation, amicus curiae. I. Used-goods sellers promote efficient markets that let low-income consumers buy goods they could not otherwise afford. (*King v Damiron Corp.,* 113 F3d 93; *Harber v Altec Indus., Inc.,* 812 F Supp 954, 5 F3d 339; *Nitro Leisure Prods., L.L.C. v Acushnet Co.,* 341 F3d 1356; *Gonzalez v Rutherford Corp.,* 881 F Supp 829; *Cruz v Midland-Ross Corp.,* 813 F Supp 628; *Sell v Bertsch & Co., Inc.,* 577 F Supp 1393; *Saratoga Fishing Co. v J. M. Martinac & Co.,* 520 US 875; *Champion Spark Plug Co. v Sanders,* 331 US 125; *Sukljian v Ross & Son Co.,* 69 NY2d 89; *Rose v Brown & Williamson Tobacco Corp.,* 53 AD3d 80.) II. Many New York industries and the public sector rely on the used-goods market. (*Torrington Indus., Inc. v Southworth-Milton, Inc.,* 17 AD3d 894.)

*Herzfeld & Rubin, P.C.,* New York City (*Michael Hoenig, Miriam Skolnik* and *Linda M. Brown* of counsel), and *Hugh F. Young, Jr.,* Reston, Virginia, for Product Liability Advisory Council, Inc., amicus curiae. I. Sellers of their own used surplus equipment such as Weyerhaeuser Company should be deemed to be occasional or casual sellers not subject to strict products liability. (*Sukljian v Ross & Son Co.,* 69 NY2d 89; *Bruce v Martin-Marietta Corp.,* 544 F2d 442; *Pelnar v Rosen Sys., Inc.,* 964 F Supp 1277.) II. In any event, strict products liability, for significant policy reasons, should not apply to even regular sellers of used goods. (*Wynia v Richard-Ewing Equip. Co., Inc.,* 17 F3d 1084; *Harber v Altec Indus., Inc.,* 812 F Supp 954, 5 F3d 339; *Sell v Bertsch & Co., Inc.,* 577 F Supp 1393; *McCarthy v Checchin,* 24 AD3d 1080; *Frisbee v Cathedral Corp.,* 283 AD2d 806; *Enright v Eli Lilly & Co.,* 77 NY2d 377; *Galindo v Precision Am. Corp.,* 754 F2d 1212; *Gonzalez v Rutherford Corp.,* 881 F Supp 829; *Nutting v Ford Motor Co.,* 180 AD2d 122.) III. In any event, the *Galindo* test for determining whether an entity is an occasional or regular seller of used goods should not be adopted. (*Galindo v Precision Am. Corp.,* 754 F2d 1212;

*Bruce v Martin-Marietta Corp.*, 544 F2d 442; *Pelnar v Rosen Sys., Inc.*, 964 F Supp 1277.)

## OPINION OF THE COURT

READ, J.

The United States Court of Appeals for the Second Circuit has asked us whether a company that sold one of its used machines (itself purchased used) to a different company can be held strictly liable for a workplace accident involving that machine, which occurred 16 years later. In light of our precedents and the policy considerations underlying strict products liability, we answer the certified question in the negative.

### I.

On March 9, 2002, plaintiff Mario Miguel Jaramillo seriously injured his right hand when he caught it between two rollers of an industrial Flexo Folder Gluer machine (FFG) that he was operating while working for his employer, Universal Glenwood Packaging Products Corporation, a manufacturer of corrugated containers, at its plant in Yonkers, New York. Jaramillo had worked for Glenwood for about five years and had operated the FFG uneventfully many times before.

In 1986, Glenwood purchased the FFG as a used machine from defendant Weyerhaeuser Company, an international forest products company with its principal place of business in the state of Washington. As part of its business, Weyerhaeuser operates numerous plants where cardboard boxes are fabricated from corrugated cardboard sheets; FFGs are used to make these boxes.

Weyerhaeuser's Investment Recovery Business (IRB), the division through which the company generally disposes of its obsolete or unneeded equipment, marketed the FFG sold to Glenwood. The IRB distributes quarterly catalogs of items for sale, advertises in trade journals, telemarkets, and conducts market research on potential buyers and dealers of used equipment. The United States District Court for the Southern District of New York found that there was no genuine dispute of fact that the FFG was sold to Glenwood in "as-is, where-is" condition, and the Second Circuit agreed (*Jaramillo v Weyerhaeuser Co.*, 2007 WL 194011, *1 n 7, 2007 US Dist LEXIS 7413, *5, n 7 [SD NY, Jan. 24, 2007], *on appeal* 536 F3d 140, 144 n 1 [2d Cir 2008]).

The IRB grossed somewhere between $7.5 million and $8.5 million in 1986, the year Glenwood bought the FFG involved in

Jaramillo's accident. This accounted for approximately .15% of Weyerhaeuser's net sales of about $5.65 billion for that year. There is no evidence in the record to show Weyerhaeuser's sales of used FFGs before 1986, but Jaramillo contends that Weyerhaeuser sold more than 60 FFGs from 1986 to 2006.

Older FFGs such as the one sold by Weyerhaeuser to Glenwood have "open architecture," or open spaces between operating sections that a worker can enter while the machine is running, which is what Jaramillo did when he injured his right hand. By contrast, "closed architecture" machines, as the name implies, do not permit entry. Open architecture machines may be retrofitted with a safety device to shut them down automatically if an open space is accessed; for example, an interlocking device or a safety mat, which causes the machine to stop when stepped on, may be installed. Weyerhaeuser has furnished some of its open architecture FFGs with interlocking devices, or has asked the manufacturer to do this. Further, the Second Circuit noted

> "evidence that Weyerhaeuser owns patents related to technology used in FFGs, and that the company maintains relationships with FFG manufacturers. [Weyerhaeuser] has occasionally made recommendations to manufacturers about how to improve FFG design, including with regard to safety features. When it has detected safety issues with an FFG, the company has also sometimes suggested that the manufacturer install a new safety mechanism in the machine in question" (536 F3d at 143).

The FFG involved in Jaramillo's accident was originally manufactured in about 1964 by S&S Manufacturing, a Brooklyn-based company that went bankrupt around 1986; it was sold new to the General Foods company. Weyerhaeuser purchased the FFG from General Foods in 1971 for roughly $36,500, and placed the machine in its Lynchburg, Virginia box plant. Weyerhaeuser added new parts to the FFG over the years and replaced worn ones, at a total cost of about $282,000, but did not change the safety mechanisms installed by S&S in the original manufacture. The machine was disassembled in Virginia by a Glenwood employee, and transported to Yonkers, where it was reassembled at the Glenwood plant.

Jaramillo filed a complaint in Supreme Court against Weyerhaeuser, seeking damages for his personal injuries. Jaramillo's

claim against Weyerhaeuser sounded principally in strict products liability. He argued that by 1986 open architecture FFGs were defective if not equipped with a safety device to shut off operation in the event a person or a foreign object, such as a human extremity, was sensed in the machine's open spaces, and that Weyerhaeuser did not add any such device to the FFG that it sold to Glenwood that year.

On March 7, 2003, Jaramillo's suit was removed to federal court. On May 22, 2006, Weyerhaeuser sought summary judgment on the basis that it was a casual seller of FFGs and therefore was not strictly liable under New York law for any defects. On June 20, 2006, Jaramillo cross-moved for summary judgment on the issue of whether Weyerhaeuser was an ordinary seller of FFGs, potentially subject to strict products liability.

On January 24, 2007, the District Court Judge granted Weyerhaeuser's motion for summary judgment, denied Jaramillo's cross motion, and dismissed the complaint. The Judge noted that "[t]he New York Court of Appeals has held that strict products liability is imposed on manufacturers and sellers who engage in product sales in the ordinary course of their business" (*Jaramillo*, 2007 WL 194011 at *3, 2007 US Dist LEXIS 7413 at *10, citing *Sprung v MTR Ravensburg*, 99 NY2d 468, 473 [2003]), but has limited "the duty of a casual or occasional seller . . . [to] warn[ing] the person to whom the product is supplied of known defects that are not obvious or readily discernible" (2007 WL 194011 at *3, 2007 US Dist LEXIS 7413 at *11-12, quoting *Sukljian v Ross & Son Co.*, 69 NY2d 89, 97 [1986] [internal quotation marks omitted]). "This is so because unlike the manufacturer or the seller of a product in the normal course of business, the occasional seller is not part of the regular commercial network for that product" (2007 WL 194011 at *3, 2007 US Dist LEXIS 7413 at *12, quoting *Sukljian*, 69 NY2d at 97 [internal quotation marks omitted; citations omitted by District Court]).

Acknowledging that there was no controlling authority from our Court requiring a ruling in his favor, Jaramillo "urge[d]" the District Court Judge "to adopt dicta in *Sukljian* and find that under these facts defendant [was] a regular seller of the machine" (2007 WL 194011 at *4, 2007 US Dist LEXIS 7413 at *13). The Judge "decline[d] plaintiff's invitation" for three reasons: "First, . . . the facts . . . [were] not . . . meaningfully distinguishable from those that the *Sukljian* court found supportive of a casual seller finding. Second, a policy analysis

support[ed] a casual seller holding. Third, on the facts of this case, there [was] no cogent reason to impose strict liability" (*id.*).

Jaramillo appealed the District Court's order. In an opinion and order issued August 1, 2008, the Second Circuit discussed the current state of strict products liability law in New York at length. Citing *Sukljian*, the court noted that New York courts make a distinction between " 'ordinary' or 'regular' sellers of a product—those who sell the product on a regular basis, through the ordinary course of business," who are "strictly liable for injuries caused by any manufacturing, design, or warning defect"; and " 'casual' or 'occasional' sellers—those who sell the product in sporadic transactions that are incidental to their businesses," whose "liability . . . extends only insofar as it fails 'to warn the person to whom the product is supplied of known defects that are not obvious or readily discernible' " (*Jaramillo*, 536 F3d at 145). The court observed that "whether the doctrine of strict products liability applies to regular sellers of *used* goods is an open question in New York" (*id.*, citing *Stiles v Batavia Atomic Horseshoes*, 81 NY2d 950, 951 [1993]).

The Second Circuit recited the "two principal reasons" that we have given "for imposing strict products liability on ordinary sellers":

> "The first is that those who sell products in the normal course of business, by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation . . . The second is that those who market products as a regular part of their businesses may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods" (*Jaramillo*, 536 F3d at 145-146, quoting *Sukljian*, 69 NY2d at 95 [internal quotation marks omitted]).

By way of contrast, the occasional seller "has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the public consumer does not have the same expectation when it buys from such a seller" (*id.* at 146, quoting *Sukljian*, 69 NY2d at 96 [internal quotation marks omitted]).

Commenting that "[w]hile the reasons behind the ordinary seller rule and occasional seller exception [were] clear, where to draw the line between ordinary and occasional sellers [was] not," the court next examined "[t]he principal case on which Jaramillo relie[d] to argue that Weyerhaeuser [was] an ordinary seller of used FFGs"—the decision by the United States Court of Appeals for the Fifth Circuit in *Galindo v Precision Am. Corp.* (754 F2d 1212 [5th Cir 1985]) (*Jaramillo*, 536 F3d at 146). In *Galindo*, the Fifth Circuit suggested that a business selling its obsolete assets could be held strictly liable for defects in those products under Texas law where certain hypothetical circumstances existed: specifically, a policy of replacing the equipment at all of its facilities at regular intervals; a division or department devoted to selling the retired equipment; widespread advertising; and substantial revenues from this activity (*see Galindo*, 754 F2d at 1219). The Second Circuit also reviewed our decision in *Sukljian*, where we discussed the *Galindo* hypothetical (*see Sukljian*, 69 NY2d at 96-97).

Concluding that

> "resolution of the summary judgment motions turn[ed] principally on . . . whether the New York courts would recognize the *Galindo* hypothetical as a case where strict liability should be imposed, and whether the facts of this case [were] sufficiently similar to that hypothetical such that Weyerhaeuser should be deemed an ordinary seller of used FFGs," the Second Circuit certified the following question to us: "Construing the evidence in the light most favorable to Jaramillo, is Weyerhaeuser Company a 'regular seller' of used Flexo Folder Gluers such that it can be held strictly liable under New York law?" (*Jaramillo*, 536 F3d at 147, 149.)

## II.

We have long held that "[m]anufacturers of defective products may be held strictly liable for injury caused by their products" (*Sukljian*, 69 NY2d at 94, citing *Voss v Black & Decker Mfg. Co.*, 59 NY2d 102, 106 [1983] [additional citations omitted]). "Imposition of this onerous liability rests largely on considerations of public policy" (*Sukljian*, 69 NY2d at 94-95). Unlike *manufacturer* strict liability, however, which applies broadly, "not every *seller* is subject to strict liability" (*id.* at 95 [emphasis added]). As we explained in *Sukljian*:

"The policy considerations that have been advanced to justify the imposition of strict liability on manufacturers and sellers in the normal course of business obviously lack applicability in the case of a party who is not engaged in the sale of the product in issue as a regular part of its business. (*See*, Restatement [Second] of Torts § 402 A, comment f, concluding: 'This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.') The casual or occasional seller of a product does not undertake the special responsibility for public safety assumed by those in the business of regularly supplying those products, nor is there the corollary element of forced reliance on that undertaking by purchasers of such goods. As a practical matter, the occasional seller has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the public consumer does not have the same expectation when it buys from such a seller. We recognized, for example, in *Gobhai v KLM Royal Dutch Airlines* (57 NY2d 839 [1982], *affg* 85 AD2d 566 [1st Dept 1981]) . . . that where distribution of an allegedly defective product is incidental to defendant's regular business the principles of strict products liability have no relevance" (69 NY2d at 95-96).

In *Sukljian*, an employee of Ardex Corporation injured his hand while cleaning the rollers of a high-speed, three-roll grinding mill manufactured and sold by Charles Ross & Son Company Inc. to General Electric Company (GE) in January 1962. In June 1973, more than 11 years after its purchase of the mill, GE decided the machine was no longer needed and included it as part of a June 1973 sale of surplus property where several hundred lots were offered. There was evidence that GE held two or three sales of surplus equipment a year, but no evidence that the company derived any profit therefrom. The terms of the June 1973 sale were "As Is, Where Is," and it was unclear how well-publicized the sale was—the only evidence of publicity was a snippet from an internal GE memorandum, which stated in its entirety "will be taken to advertise the sale through the various medias available, such as newspapers, trade magazines,

trade papers, etc." (*Sukljian*, 69 NY2d at 93.) The mill was sold by GE for $35 and subsequently resold multiple times until it ended up in the hands of Ardex, where the accident victim worked. The accident occurred in 1978, five years after the mill was sold as surplus by GE; the victim's father brought suit against GE on a theory of strict products liability.

Considering these facts, we specifically held that a "corporation that sold a machine previously used in its own production as surplus property was not liable to remote purchasers . . . in strict products liability . . . for injuries allegedly resulting from a defect in the machine, and should have been awarded summary judgment dismissing the complaint" (*id.* at 92). Despite the facts that GE regularly held sales of surplus equipment, that these sales were quite extensive (although not especially lucrative), and that they were apparently publicized (although the amount of publicity was in dispute), we flatly rejected the "assert[ion] that there is a question of fact whether [GE] was in reality in the regular business of a second-hand equipment dealer" (*id.* at 96), an assertion explicitly relying on *Galindo*.

In *Galindo* itself, the court was faced with a strict products liability claim against the Georgia-Pacific Corporation, which operated more than 240 sawmills and plants and regularly sold its used sawmill equipment to dealers. The plaintiff in *Galindo* was severely injured while operating a sawmill trimmer that Georgia-Pacific sold used to someone who sold it to a company that, in turn, sold it to the plaintiff's employer. The Fifth Circuit "d[id] not believe that it necessarily follow[ed]" under Texas law "that getting rid of the depreciated equipment used for production of the goods and services that constitute the business of the seller can never constitute a business in which the seller is engaged" (*Galindo*, 754 F2d at 1219 [internal quotation marks omitted]), and hypothesized a particular situation in which the policies underlying strict products liability might exist in this context. In particular, the Fifth Circuit

> "[s]uppose[d], for example, that Georgia-Pacific [had] a policy of purchasing new equipment at all of its sawmills every five years. Suppose further that Georgia-Pacific [had] a division or department devoted to selling the used equipment, that the department advertise[d] the availability of equipment on a widespread basis, and that it realize[d] substantial revenues from this activity. Clearly, on

such facts, Georgia-Pacific would not be exempted from [strict products] liability simply because the equipment [was] used" (*id.*).

In *Sukljian*, we distinguished *Galindo* on the facts. We also explicitly declined to recognize its reasoning, stating that

"[e]ven if we were to recognize that liability might be imposed in a case such as hypothesized in *Galindo* . . . [t]here is no basis in the undisputed facts before us to support an inference that [GE], in incidentally disposing of the mill at a surplus equipment sale in the manner it did, undertook any special responsibility to the public for product safety, or was perceived by the public as having done so, or was better able to spread any loss caused by such defective products, making it more equitable to impose such loss on the seller. While we recognize that more than the single or isolated sale of a jam jar, a pound of sugar or an automobile described in the Restatement (Restatement [Second] of Torts § 402 A, comment f) is at issue here, still the principle is the same whether an individual, or an airline, or a huge corporation disposing of its surplus equipment in an occasional sale is involved: there is no basis in public policy for the imposition of strict liability" (*Sukljian*, 69 NY2d at 96-97).

Seven years later in *Stiles*, we reaffirmed *Sukljian*. In *Stiles*, the plaintiff was injured while operating a punch press owned by his employer, which had purchased the press in used condition from Batavia. Batavia bought five punch presses at auction, kept two and resold the other three, including the one sold to the plaintiff's employer (*see Stiles v Batavia Atomic Horseshoes*, 174 AD2d 287, 289 [4th Dept 1992]).

The jury awarded damages to the plaintiff, "conclud[ing] that Batavia was a regular seller of used goods and thus, under the court's instructions, accountable to plaintiff under the theory of strict products liability" (*Stiles*, 81 NY2d at 951). We found the trial court's affirmed finding of fact that defendant "engaged in sales of equipment as a 'regular part of its business' " to be unsupported by the record (*id.*), despite evidence, cited in the Appellate Division's decision, that "during the two years Batavia was in business, Batavia bought and resold used industrial machinery on at least two other occasions, one before and the other after the auction at which Batavia bought the punch press

in question," and "that on each occasion Batavia realized a substantial profit on the sale of the used machinery" (*Stiles*, 174 AD2d at 290).

We noted, however, that "Batavia's business was the manufacture and sale of horseshoes," and that on the three occasions when it had engaged in the purchase and resale of industrial equipment, "it purchased [the] used equipment in lots intending to keep much of the machinery for its own purposes"; indeed, "[t]he press sold to [the plaintiff's employer] was never unloaded at Batavia, but instead [was] sold directly off the truck that had transported it from an equipment auction and was in the possession of Batavia at its facility for approximately one hour before [the plaintiff's employer] took delivery of it" (*Stiles*, 81 NY2d at 951). Because we concluded that "this evidence fail[ed] as a matter of law to support a finding that Batavia was a regular seller of used goods," we did "not reach the question reserved in *Sukljian* and submitted by the parties to [the] appeal, i.e., whether the doctrine of strict products liability applies to regular sellers of used goods" (*id.*).

This case is controlled by *Sukljian* and the policy considerations underlying our holding in that case. The "onerous" burden of strict liability is only imposed on "certain sellers" because of "continuing relationships with manufacturers" and a "special responsibility to the public, which has come to expect [these sellers] to stand behind their goods" (*Sukljian*, 69 NY2d at 94-95). The second of these policy goals is clearly absent here: buyers of Weyerhaeuser's used (third-hand, in fact) equipment at irregularly-scheduled "as is, where is" surplus sales cannot reasonably "expect [Weyerhaeuser] to stand behind [someone else's] goods." As to the first policy goal, while Weyerhaeuser may have had a closer relationship with FFG manufacturers than a customer would have with a supplier of run-of-the-mine equipment not unique to its particular industry, this relationship was still general in nature and even more attenuated with respect to the FFGs that Weyerhaeuser sold as surplus. Indeed, the FFG involved in Jaramillo's accident was actually bought used by Weyerhaeuser from a third party rather than new from an FFG manufacturer. Simply put, there is no reason to believe that imposing strict liability on Weyerhaeuser's sales of its scrap, used FFGs would create any measurable "pressure for the improved safety of products" on FFG manufacturers. Indeed, the most likely effect would be exactly what the District Court predicted: Weyerhaeuser would stop

selling its used machinery, thus depriving small businesses of the ability to purchase otherwise unaffordable equipment.

While there may be some imaginable future case in which the facts justify imposition of strict products liability on a seller of used goods, this case is not—just as *Sukljian* and *Stiles* were not—that case. In sum, "[c]onstruing the evidence in the light most favorable to Jaramillo," Weyerhaeuser Company is not a " 'regular seller' of used Flexo Folder Gluers such that it can be held strictly liable under New York law" (*Jaramillo*, 536 F3d at 149).

Accordingly, the certified question should be answered in the negative.

Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.